**F.W.F., INC., plaintiff,**

v.

**DETROIT DIESEL CORPORATION, and Johnson & Towers, Delaware, Inc., defendants.**

No. 04–81200–CIV.

United States District Court, S.D. Florida.

June 25, 2007.

Andrew Warren Anderson, Matthew John Valcourt, Houck Anderson PA, Miami, FL, for Plaintiff.

Scott M. Sarason, Christina Anne McGinley, Rumberger Kirk & Caldwell, Miami, FL, for Defendants.

## ORDER ADOPTING MAGISTRATE'S REPORT AND RECOMMENDATION & GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT AGREEMENT [DE # 46]

HURLEY, District Judge.

**THIS CAUSE** is before the court upon the plaintiffs motion to enforce settlement agreement filed May 31, 2006 [DE# 46]. This matter was previously referred to United States Magistrate Judge James Hopkins pursuant to 28 U.S.C. §§ 636–39 and Rule 72 of the Federal Rules of Civil Procedure, for a recommended disposition.

On May 29, 2007, Magistrate Judge Hopkins filed a report and recommendation upon the motion. [DE # 106]. On June 8, 2007, plaintiff filed its objections to the report and recommendation [DE# 107] and on June 20, 2007, the defendant MTU Detroit Diesel, Inc. f/k/a Detroit Diesel Corporation filed its response to the plaintiff's objections [DE# 108].

Having carefully reviewed the Magistrate Judge's report and recommendation, and having reviewed *de novo* those portions of the report to which the plaintiff has lodged objection, the court has determined to overrule the objections and adopt the recommendation of the Magistrate Judge.

It is accordingly **ORDERED** and **ADJUDGED:**

1. The report and recommendation of Magistrate Judge James Hopkins on the plaintiff's motion to enforce settlement [DE# 107] is **ADOPTED.**

2. The plaintiff's motion to enforce settlement [DE# 46] is **GRANTED in**

PART and DENIED in PART as follows:

A. The court finds that the defendant did fail to timely reimburse plaintiff for all attorneys fees and costs incurred in the underlying litigation ($205,521.35), but finds that this was not a material breach of the agreement because a partial payment of $189,008.23 was timely tendered, and any delay in remittance of the balance was relatively minor and did not go to the essence of the agreement. *See generally Crowley Am Transp. Inc. v. Richard Sewing Machine Co.,* 172 F.3d 781, 784 (11th Cir.1999).

To the extent it has not already done so, the defendant is obligated to pay plaintiff the outstanding balance of $16,513.16 on this obligation, together with prejudgment interest on this sum running from September 15, 2006, the date it became due, to the date of final payment at the rate of 8.25% per annum, or $3.73 per day. The defendant shall satisfy any remaining portion of this obligation by payment made to plaintiff within **TWENTY (20) DAYS** from the date of entry of this order. To this limited extent, the plaintiff's motion to enforce settlement agreement is **GRANTED.**

B. As the court finds that neither party has materially breached the settlement agreement, the plaintiff's motion to enforce the settlement agreement is otherwise **DENIED.**

3. Both parties shall bear their own attorneys fees and costs incurred in the prosecution or defense of the motion to enforce settlement.

---

1. Plaintiff Gerald Abrams is the beneficial owner of the M/Y *Lady Jane.* For the sake of simplicity, F.W.F., Inc. and Gerald Abrams will hereinafter collectively be referred to as "Plaintiffs."

---

## REPORT AND RECOMMENDATION AS TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT (DE 46)

HOPKINS, United States Magistrate Judge.

THIS CAUSE comes before the Court upon an Order referring Plaintiffs' Motion to Enforce Settlement Agreement, Motion for Sanctions and Motion to Place the Motions and Exhibits Under Seal (DE 46) (the "Motion to Enforce Settlement Agreement") to the undersigned Magistrate Judge for Report and Recommendation (DE 47). This matter, which has been fully briefed and heard during a two-day evidentiary hearing, is now ripe for review. For the reasons stated below, the undersigned **RECOMMENDS** that the Motion to Enforce Settlement Agreement be **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

### A. The Underlying Lawsuit

This is the story about the M/Y *Lady Jane,* a 65 foot Viking Sportfish motor yacht. In June 2001, Plaintiffs F.W.F., Inc. and Gerald Abrams[1] purchased the M/Y *Lady Jane* from HMY Yacht Sales, Inc. They paid additional money for an engine upgrade to the 1800 horsepower, 16V 2000 M90 diesel engines manufactured by Defendant Detroit Diesel Corporation ("Defendant"). Defendant warranted, specified and agreed that the 16V 2000 M90 engines would develop 1800 horsepower at 2300 revolutions per minute.

At the time of delivery, in July 2001, Plaintiffs ascertained that the port engine was unable to generate the specified horsepower and torque as warranted, an-

notated the delivery paperwork to that effect and rejected the engine as unsatisfactory. Over the next several years, Defendant attempted to cure and correct the power problem. Indeed, Defendant rebuilt the port engine on five separate occasions. Defendant, however, did not acknowledge any defect in the port engine and took the position that the inability of the engine to develop full power was caused by propellers that were not properly matched to the engines and offered to pay for propeller modifications. Defendant proposed other solutions while attempting to diagnose the problem.

Plaintiffs ultimately sued Defendant and Johnson & Towers, Inc.,[2] the yacht broker, for damages related to the port engine's failure to produce the guaranteed, specified engine power output. (DE 1). They invoked admiralty jurisdiction under 28 U.S.C. § 1333(1) and Rule 9(h) of the Federal Rules of Civil Procedure (*see id.* ¶¶ 11–12),[3] asserting claims for revocation of acceptance (Count I), breach of warranty (Count II), breach of warranty of workmanlike performance (Count III), breach of express and implied warranties pursuant to the Magnuson–Moss Warranty— Federal Trade Commission Improvement Act (the "Magnuson–Moss Warranty Act"), 15 U.S.C. §§ 2301–12 (Count V) and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 to .213 (Count VI). Plaintiffs sought to recover, among other things, compensatory damages, punitive damages, attorneys' fees and costs, and pre-judgment interest.

After the lawsuit was filed, and before the lawsuit was settled, Defendant determined that the port engine was "slightly retarded" as a result of a mechanical or manufacturing defect. In other words, it concluded that the port engine was not producing full power because the fly wheel hub, when placed on the crank shaft, probably shifted a couple of degrees out of properly timed position. Because the issue of liability, for all intents and purposes, was apparent, the only matter then in dispute was the issue of damages.

## B. The Settlement Agreement

On November 18, 2005, the parties attended mediation in Miami, Florida. Plaintiffs were represented by Gerald Abrams, and their attorneys, Andrew W. Anderson and Matthew J. Valcourt, and in-house employee, Christopher Karentz. Defendant was represented at mediation by Ulrich Kemnitz, Scott Woodruff, Brian Howe, and its attorneys, Scott M. Sarason and Christina McGinley Paul. The parties reached a compromise during mediation and memorialized the terms of their agreement in a handwritten, memorandum of settlement (hereinafter "settlement agreement").

The settlement agreement consists of four pages (with the first page bearing the style of this action), and was jointly drafted by (and was the joint product of) the parties and their counsel in attendance. The settlement agreement states:

MEMORANDUM OF SETTLEMENT

THIS CAUSE, having been submitted to mediation before James A. McCauley, Mediator, upon Order of the above-styled Court and/or stipulation between the parties, it is hereby stipulated and

---

**2.** Although listed as a defendant, Johnson & Towers, Inc. was never served and never entered an appearance in the case.

**3.** Plaintiffs also invoked federal question jurisdiction under 28 U.S.C. § 1331, diversity jurisdiction under 28 U.S.C. § 1332 and supplemental jurisdiction under 28 U.S.C. § 1367. (DE 1 ¶¶ 10–11).

agreed between said parties that settlement has been reached as follows:

1.) Detroit Diesel to install [two] new factory built 2000HP [16V 2000 M91 engines], including:

    A) All new gears and accessories for engines;

    B) All costs for install including all accessories.

2.) Detroit Diesel to have [two] calendar months to build engines.

3.) Detroit Diesel to have [two] months to install [and] test new engines.

4.) Detroit Diesel to pay for shipyard cost for removal of engines, and all accessories.

5.) Detroit Diesel to commence installation after July 31, 2006. However, if either the port or starboard engines require material repair or warranty work, Detroit Diesel, at its option in lieu of warranty work, can install both new engines at that time.

6.) Detroit Diesel to pay up to and including $150,000 in attorneys fees and costs. Invoices to be provided [within sixty] days from November 18, 2005.

7.) Detroit Diesel to pay up to and including $60,000 of expert technical fees and costs. Invoices to be provided [within sixty] days from November 18, 2005.

8.) Payment of attorneys fees, costs and expert fees and costs to be made [within sixty] days of receipt of invoices.

9.) Installation of engines and gears and removal of engines and gears to be performed at a mutual agreeable shipyard(s) by the parties in writing.

10.) Plaintiffs agree to sign a reasonable confidentiality agreement upon settlement.

11.) Plaintiffs to grant the existing engines to Detroit Diesel and execute documents to transfer ownership of engines.

12.) Detroit Diesel is allowed a [two-week] period to go aboard the Lady Jane, to conduct, at their expense, tests by a mutually agreed protocol [and] Plaintiffs allowed to have a captain aboard during testing at Detroit Diesel's expense.

13.) Detroit Diesel to grant a [five-year] warranty to Plaintiffs commencing after installation and successful seatrial of vessel engines.

14.) The parties, upon full settlement, agree to execute mutual releases.

15.) The parties stipulate that the court remove the case from trial docket, and stay the case pending full implementation of the settlement.

(DE 94 [Ex. 1] [hereinafter "SA ¶ _"]). The parties signed or initialed each page of the settlement agreement.

On November 25, 2005, the mediator filed his final report stating the matter had been settled (DE 37), and Plaintiffs filed a Notice of Settlement on November 30, 2005 (DE 38). The parties stipulated to dismissal without prejudice (DE 43) and on January 26, 2006, the Court entered an Order of Final Dismissal without Prejudice & Close–Out (DE 44). The Court retained jurisdiction to enforce the terms of the settlement agreement.

## C. The Parties' Course of Performance Post–Settlement

After mediation, a number of events occurred, which created confusion over the parties' respective rights and obligations under the settlement agreement. Unfortunately, and despite the apparent success at mediation, this confusion led to a breakdown of cooperation between the parties.

The initial disagreement concerned Defendant's promise to pay all costs to install the new, factory built 16V 2000 M91 engines, including all accessories. While negotiating a "more formal" settlement agreement, Plaintiffs took the position that

this promise included payment of all costs to modify the exhaust system, install new propellers, and perform any other work necessary for the M/Y *Lady Jane* to successfully pass a sea trial. Defendant rejected this interpretation of the settlement agreement. This particular dispute was the main reason why the parties were unable to commence the repair of the vessel.

A second disagreement between the parties manifested itself while Defendant investigated which gear would be appropriate for installation with the 16V 2000 M91 engine. Initially, Defendant wanted to pair the 16V 2000 M91 engine with a ZF 2555 gear because this was the engine/gear combination that Viking Yachts was selling with their current production vessels. However, unbeknownst to Defendant, the hull configuration on Viking's current production vessels was different than the hull configuration of the M/Y *Lady Jane*. Defendant requested information from Viking Yachts and Johnson & Towers, Inc. so it could perform a comparative analysis and determine whether the M91/ZF combination was feasible. After reviewing this information, Defendant determined that the M91/ZF combination was not practicable because it would require additional modifications to the M/Y *Lady Jane's* engine room, potentially impacting the overall structural integrity of the vessel. Consequently, Defendant changed course and consulted with Twin Disc, Inc. to obtain their recommendation. Twin Disc, Inc. ultimately recommended and rated the Twin Disc 6598 gear for use with the 16V 2000 M91 engine. In light of this recommendation, as well as the fact that installation of this gear was less intrusive because it was identical in size and weight to the gear already installed in the M/Y *Lady Jane*, Defendant ordered the Twin Disc 6598 gear. Plaintiffs, somewhat surprised about Defendant's change of course, objected to the Twin Disc 6598 gear on grounds that it was not an adequate and proper substitute for the ZF 2555 gear.

While the parties were squabbling over the amount of costs, scope of work and gears, a third disagreement arose over Defendant's obligations regarding the selection of a mutually agreeable shipyard. Although the parties tacitly agreed in principle to perform the repairs at Cable Marine, neither memorialized this agreement in a formal writing. Plaintiffs then took the position that Defendant was also obligated to provide a written scope of work, and specify the payment arrangements. Defendant, although objecting to this interpretation, ultimately provided a scope of work. However, this was not deemed sufficient by Plaintiffs in light of the ongoing dispute over the amount of costs, scope of work and gears.

The final disagreement concerned Defendant's obligation to pay up to and including $150,000.00 in attorney's fees and costs, as well as up to and including $60,000.00 in expert technical fees and costs. Plaintiffs submitted invoices evidencing a combined total of $205,521.39 in attorney's fees, expert technical fees and costs. Defendant contested the accuracy of Plaintiffs' calculations, especially noting that they were seeking payment of expert technical fees and costs over the amount evidenced by invoices. This confusion was likely caused by the fact that Plaintiffs only submitted "expert technical" invoices from third-parties in the total amount of $39,022.73, without explaining whether any such fees were also contained in the "matter ledger" evidencing attorney's fees and costs. As a result, Defendant, on numerous occasions, tendered payment in the amount that it deemed appropriate under the terms of the settlement agreement. Plaintiffs rejected each and every tender, insisting that they were entitled to recover the combined total of fees and costs with-

out further explanation. In an attempt to clarify their position, Plaintiffs' counsel submitted portions of a "time diary" from an in-house employee, and explained that the non-redacted fees constitute expert technical fees. Defendant did not take any further action on this issue.

## D. Procedural History Relevant to Plaintiffs' Motion to Enforce Settlement Agreement

On May 31, 2006, Plaintiffs filed their Motion to Enforce Settlement Agreement. (DE 46). Defendant filed its memorandum in opposition on June 12, 2006 (DE 48) and Plaintiffs filed a reply memorandum on June 21, 2006 (DE 50). On August 25, 2006, the undersigned issued an order permitting the parties to conduct limited discovery (DE 53), and an order directing Plaintiffs to brief certain issues and permitting Defendant to file a response if deemed necessary (DE 52). Plaintiffs filed a memorandum of law responsive to this order on September 8, 2006 (DE 55), and Defendant filed a memorandum in response on September 25, 2006 (DE 56).

On December 1, 2006, the undersigned issued an order resolving a discovery dispute, authorizing the parties to conduct limited, expedited discovery, setting deadlines to file exhibit and witness lists and proposed findings of fact and conclusions of law, and continuing the evidentiary hearing a second time to December 21, 2006. (DE 68). On December 11, 2006, the parties filed their witness and exhibit lists. (DEs 69–71). Defendant also filed a motion to strike Plaintiffs' "late filed" exhibit list and to compel responses to discovery and for sanctions (DE 72), which was denied without prejudice on December 14, 2006 (DE 73).

Defendant and Plaintiffs filed their initial proposed findings of fact and conclusions of law on December 15 and 18, 2006 respectively. (DEs 75, 79). Plaintiffs filed the following additional documents prior to the December 21, 2006 evidentiary hearing: (1) amended exhibit list (DE 80); (2) notice of designating portions of the September 14, 2005 deposition testimony of Brian Howe (DE 82); (3) notice of filing deposition of Brian Howe taken on September 14, 2005 (DE 85); (4) notice of designating portions of the September 27, 2005 deposition testimony of Ulrich Kemnitz (DE 83); (5) notice of filing deposition of Ulrich Kemnitz taken on September 27, 2005 (DE 84); and (6) notice of designating portions of the December 7, 2006 deposition testimony of Brian Howe (DE 86). Defendant filed the following additional documents prior to the December 21, 2006 evidentiary hearing: (1) objections to Plaintiffs' exhibit list (DE 78); (2) amended exhibit and witness list (DE 81); (3) notice of objections to the designations of depositions taken of Brian Howe on September 14, 2005 and Ulrich Kemnitz on September 27, 2005 (DE 89); (4) notice of filing objections to Plaintiffs' amended exhibit list (DE 90); (5) notice of designating portions of the December 19, 2006 deposition testimony of George Cable (DE 92); and (6) notice of filing deposition of George Cable taken on December 19, 2006 (DE 91).

The evidentiary hearing went forward as scheduled on December 21, 2006. (DEs 93, 104). After the parties each made an opening statement, counsel for Plaintiffs called Brian Howe, Scott Woodruff and Lee Swanger as witnesses. Upon request by the parties, the evidentiary hearing was continued to January 24, 2007. (DE 96). In the mean time, the parties submitted their final witness and exhibit lists (DEs 94–95), Plaintiffs filed objections to the deposition testimony of George Cable (DE 97), and Defendant filed a response to these objections (DE 101) and a revised notice of objections to the designations of

depositions taken of Brian Howe on September 14, 2005 and Ulrich Kemnitz on September 27, 2005 (DE 100).

The continuation of the evidentiary hearing went forward as scheduled on January 24, 2007. (DEs 98–99). Plaintiffs' counsel called Gerald Abrams and Richard Learned as witnesses. Counsel for Defendant called Thomas Schoepel as a rebuttal witness. At the hearing's conclusion, the parties agreed to take the deposition of Stewart Hutcheson within twenty days, and to file amended, proposed findings of fact and conclusions of law no later than February 23, 2007. (DE 98). Plaintiffs and Defendant filed their amended, proposed findings of fact and conclusions of law on that date. (DEs 102–03).

## II. DISCUSSION

This cause came for evidentiary hearing before the Court, Honorable James M. Hopkins, United States Magistrate Judge, presiding. These issues having been duly presented, the undersigned makes and enters its proposed findings of fact, conclusions of law and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 1(d) of the Magistrate Judge Rules of the United States District Court for the Southern District of Florida. "To the extent that any finding of fact may be interpreted or construed as a conclusion of law, or any conclusion of law may be interpreted or construed as a finding of fact, it is the Court's intention that such construction or interpretation be adopted." *Clarendon Nat'l Ins. Co. v. Ins. Co. of the West*, 442 F.Supp.2d 914, 943 (E.D.Cal.2006).

In general, Plaintiffs are asking this Court to enforce the settlement agreement according to their interpretation, hold the Defendant in breach of the settlement agreement based on that interpretation, and award certain types of relief as a remedy for breach of the settlement agreement, including, but not limited to, compensatory damages, punitive damages, attorney's fees, costs, pre-judgment interest, specific performance (including a performance bond in the amount of $1,000,000.00), diminution in market value of the M/Y *Lady Jane* as a result of the delay in carrying out the engine replacement, and sanctions in the amount of $100,000.00. (DEs 55 at 11–15; 102 at 39–41). Defendant contests each and every request for relief, claims that it has complied with the terms of the settlement agreement, maintains that it is ready, willing and able to commence the "engine repower" of the M/Y *Lady Jane*, and argues that Plaintiffs are in breach of the settlement agreement.

As framed by the parties, this case requires the Court to resolve multiple issues, including but not limited to: (1) which law, federal or state, governs the dispute; (2) the interpretation of the settlement agreement's disputed terms, and ascertainment of the parties' intent; (3) whether the settlement agreement has been breached by either party; and (4) if so, whether the law governing this dispute permits the non-breaching party to recover the relief requested. The undersigned will address all of the issues presented in turn below.

### A. Choice of Law: General Federal Maritime Law Governs this Dispute

Plaintiffs are attempting to enforce an agreement between the parties to settle the underlying lawsuit, which invoked federal question, diversity, admiralty and supplemental jurisdiction over federal and state claims based on common law, general federal maritime law and statutory law. Thus, a threshold issue in this case is which law, federal or state, governs the dispute.

Plaintiffs completely fail to address the choice-of-law issue in their memoranda of law. (DEs 46, 50, 55, 79, 102). Indeed, it

is unclear which law they believe should govern this dispute because they cite to multiple sources from multiple jurisdictions in support of their proposed conclusions of law. (DE 102 at 13–39). Defendant argues that settlement agreements executed in Florida are governed by Florida law. (DE 103 at 16–19). It does not, however, provide any meaningful choice-of-law analysis beyond just asserting the general proposition.

## 1. The Choice of Substantive Law to be applied in this Case is Governed by Federal Maritime Choice–of–Law Rules because the Underlying Lawsuit Justifies the Exercise of Admiralty Jurisdiction

■ The first step in a choice-of-law analysis, where a party has invoked subject matter jurisdiction on multiple grounds, is to determine the basis of the court's jurisdiction or power to adjudicate the underlying claims. *See, e.g., Calhoun v. Yamaha Motor Corp., U.S.A.,* 216 F.3d 338, 343 (3d Cir.2000); *Aqua–Marine Constructors, Inc. v. Banks,* 110 F.3d 663, 670 (9th Cir.1997) [hereinafter *Aqua–Marine].* "This is so because a federal court sitting in diversity applies the choice-of-law rules of the forum state, . . . whereas a federal court sitting in admiralty must apply federal maritime choice-of-law rules." *Aqua–Marine,* 110 F.3d at 670 (citation omitted).

■ The Court concludes, for purposes of this report and recommendation, that all of the claims against Defendant, regardless of how plead in the Complaint, are cognizable only in admiralty. First, the nature, character and subject matter of the underlying lawsuit relates to maritime service or maritime transactions. *See, e.g., N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,* 249 U.S. 119, 122–29, 39 S.Ct. 221, 63 L.Ed. 510 (1919) (explaining, *inter alia,* that admiralty jurisdiction extends to matters of contract where the nature, character and subject matter of the contract relates to maritime service or maritime transactions). "It is well settled that a contract to repair a vessel is maritime." *Alcoa S.S. Co. v. Charles Ferran & Co.,* 383 F.2d 46, 50 (5th Cir.1967). Indeed, "[t]hose who repair a vessel or the equipment aboard it make a warranty, the implied warranty of workmanlike performance." *Houston–New Orleans, Inc. v. Page Eng'g Co.,* 353 F.Supp. 890, 898 (E.D.La.1972). "Consequently, a shipowner has a maritime cause of action whether he sues in contract for breach of warranty of workmanlike service or in tort for the negligent performance of a maritime contract." *Alcoa S.S. Co.,* 383 F.2d at 50. Here, Plaintiffs asserted a total of five claims for relief in the alternative to redress the same wrong—Defendant's alleged failure to repair the M/Y *Lady Jane's* port engine, or correct any malfunction occurring from defects in material or workmanship. If Plaintiffs had ultimately established liability under more than one of these claims, they would have been required to elect only one remedy because a party cannot obtain a double recovery for the same wrong. *See generally* 25 Am. Jur.2d *Election of Remedies* § 13 (2007) (discussing the timing of election, and the point at which the doctrine applies).

■ Second, general federal maritime law preempts a claim for damages under the FDUTPA and the Magnuson–Moss Warranty Act. *See DeRossi v. Nat'l Loss Mgmt.,* 328 F.Supp.2d 283, 288–89 (D.Conn.2004) (concluding that admiralty law preempts a claim under the Connecticut Unfair Trade Practices Act because "the damages provisions . . . regarding attorney's fees and punitive damages are not consistent with the standards established in admiralty law"); *Stires v. Carnival Corp.,* 243 F.Supp.2d 1313, 1321–23 (M.D.Fla.2002) (dismissing claim under the

FDUTPA, in an admiralty action, for failure to sufficiently plead damages, and striking request for punitive damages and attorney's fees); *Norwalk Cove Marina, Inc. v. S/V Odysseus,* 90 F.Supp.2d 190, 192–93 (D.Conn.2000) (dismissing claim under the Connecticut Unfair Trade Practices Act, concluding that the statute conflicts with admiralty law because it "allows for the award of attorneys fees and punitive damages without meeting the standards established for such awards in admiralty law"), *aff'd,* 64 Fed.Appx. 319, 320 (2d Cir.2003); *Delta Marine, Inc. v. Whaley,* 813 F.Supp. 414, 416–17 (E.D.N.C.1993) (concluding that the North Carolina Unfair and Deceptive Trade Practices Act was preempted by admiralty law); *Geftman v. Boat Owners Ass'n of the United States,* No. C/A 2:02–1461–18, 2003 WL 23333312, at *1–5 (D.S.C. Dec. 2, 2003) (concluding that the South Carolina Unfair Trade Practices Act was preempted by admiralty law); *cf. also Hetzel v. Bethlehem Steel Corp.,* 50 F.3d 360, 363–67 (5th Cir.1995) (concluding that the Texas Deceptive Trade Practices Act was preempted by the Longshore and Harbor Workers' Compensation Act); *Southworth Mach. Co. v. F/V Corey Pride,* 994 F.2d 37, 40–42 (1st Cir. 1993) (concluding that attorney's fees provision in the Massachusetts Consumer Protection Act could not be applied in the case because it was inconsistent with admiralty law); *Garan Inc. v. M/V Aivik,* 907 F.Supp. 397, 398–401 (S.D.Fla.1995) (concluding that the Florida offer-of-judgment statute was preempted by admiralty law because it permitted a party to recover attorney's fees); *Tarnawski v. Schenker, Inc.,* No. C02–5659 FDB, 2003 WL 22721987, at *4 (W.D.Wash. May 6, 2003) (concluding, *inter alia,* that the Washington Consumer Protection Act was preempted by the Carriage of Goods by Sea Act). *But cf. F/V Robins Nest, Inc. v. Atl. Employers Ins. Co.,* Civ. A. No. 92–3900(JEI), 1994 WL 594592, at *1–3 (D.N.J. Oct. 24, 1994) (concluding that the New Jersey Consumer Fraud Act was not preempted by admiralty law). Thus, Counts V and VI of the Complaint may have been dismissed if this case ultimately had gone to trial.

Third, general federal maritime law is applied regardless of whether the suit is brought in the admiralty forum, on the "law side" of the federal court in diversity or in state court. *See, e.g., Butler v. Am. Trawler Co.,* 707 F.Supp. 29, 31–33 (D.Me. 1989) (applying admiralty law to maritime tort where plaintiff only invoked diversity jurisdiction). In its most basic form, Plaintiffs' underlying lawsuit was nothing more than an action in admiralty for breach of warranty of workmanlike performance. Because the underlying lawsuit justifies the exercise of admiralty jurisdiction, the choice of substantive law to be applied in this case is governed by federal maritime choice-of-law rules. *See, e.g., Calhoun,* 216 F.3d at 343–45; *Aqua–Marine,* 110 F.3d at 670–73; *Sundance Cruises Corp. v. Am. Bureau of Shipping,* 7 F.3d 1077, 1080–81 (2d Cir.1993).

## 2. The Federal Maritime Choice-of-Law Rules

After determining the basis of jurisdiction over the subject matter, the next step in the choice-of-law analysis is to determine the admiralty choice-of-law rule. *See, e.g., Calhoun,* 216 F.3d at 345–51; *Aqua–Marine,* 110 F.3d at 673–75; *Sundance Cruises Corp.,* 7 F.3d at 1080–82. "When the court determines what rule governs the choice of law, it will then determine what law is to be chosen by that rule" under the particular facts and circumstances of the case. 15A C.J.S. *Conflict of Laws* § 27 (2007). A review of general federal maritime law reveals two choice-of-law rules that must be resolved in this case in order to properly determine the rights, liabilities and remedies of the parties.

### a. General Federal Maritime Law Governs the Validity and Enforceability of the Settlement Agreement because the Substantive Rights and Liabilities of the Parties Derive from Federal Law

■ The first choice-of-law rule concerns the validity and enforceability of the settlement agreement. The enforceability or validity of a settlement agreement "is determined by federal law where the substantive rights and liabilities of the parties derive from federal law." *Villaneuva Compania Naviera, S.A. v. Bethlehem Steel Corp. (In re Complaint of Bankers Trust Co.)*, 752 F.2d 874, 883 (3d Cir.1984) [hereinafter Villaneuva]; *accord Borne v. A & P Boat Rentals No. 4, Inc.*, 780 F.2d 1254, 1256 (5th Cir.1986); *Gisclair v. Tug Chantel Naquin, Inc.*, 694 F.Supp. 204, 206 (E.D.La.1988).

■ The settlement agreement in this matter is a contract to abandon claims that are cognizable only in admiralty. Accordingly, general federal maritime law governs the validity and enforceability of the settlement agreement. *See Borne*, 780 F.2d at 1256; *Villaneuva*, 752 F.2d at 883–84; *Gisclair*, 694 F.Supp. at 206. "The law to be applied in this case is federal, since the rationale behind the court's admiralty jurisdiction is the interest in dealing with all the major concerns of the shipping industry as one body of law." *Villaneuva*, 752 F.2d at 883–84.

### b. General Federal Maritime Law Governs the Interpretation of the Settlement Agreement because it is a Maritime Contract and because this Dispute is not Inherently Local

The second choice-of-law rule concerns the interpretation of the settlement agree-

ment. In order to determine which law applies, the Court must resolve two sub-issues: (1) whether the settlement agreement is a maritime contract; and (2) if so, whether the particular issue to be resolved is of such a local nature that state law should be applied. *See, e.g., Alcoa S.S. Co.*, 383 F.2d at 50 (outlining the two-step analysis to determine which law governs the construction of the terms of a maritime contract).[4]

### i. The Settlement Agreement is a Maritime Contract

■ "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22–23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961)). "To ascertain whether a contract is a maritime one, [a court] cannot look to whether a ship or other vessel was involved in the dispute, as [the court] would in a putative maritime tort case." *Id.* "Nor can [the court] simply look to the place of the contract's formation or performance." *Id.* at 24, 125 S.Ct. 385. "Instead, the answer 'depends upon ... the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'" *Id.* (quoting *N. Pac. S.S. Co.*, 249 U.S. at 125, 39 S.Ct. 221).

■ The settlement agreement is a maritime contract because its primary purpose, besides the "settlement" of the underlying admiralty claim, is to repair the M/Y *Lady Jane's* port engine. *See, e.g., Southworth Mach. Co.*, 994 F.2d at 38–41 (explaining that admiralty law governed

---

4. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

contract involving the sale and installation of a rebuilt engine for use on an existing commercial vessel); *Edward Leasing Corp. v. Uhlig & Assocs., Inc.,* 785 F.2d 877, 878–82 (11th Cir.1986) (exercising admiralty jurisdiction over claim for breach of a maritime contract for the removal, rebuilding and reinstallation of motor yacht's two MTU diesel engines); *Booth S.S. Co. v. Meier & Oelhaf Co.,* 262 F.2d 310, 311–13 (2d Cir.1958) (concluding that admiralty law governed the interpretation of a repair contract to overhaul vessel's engines); *Todd Marine Enters., Inc. v. Carter Mach. Co.,* 898 F.Supp. 341, 342–43 (E.D.Va.1995) (concluding that admiralty law governed contract to install new engines aboard vessel); *cf. Alcoa S.S. Co.,* 383 F.2d at 50 (concluding that admiralty law governed contract to repair vessel's boiler); *Houston–New Orleans, Inc.,* 353 F.Supp. at 897–98 (concluding that admiralty law governed contract to repair a control panel on a barge, as well as a contract to fabricate a new console to be installed on the barge). *See generally* 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MAR. L. § 5–7 (4th ed.2003) (discussing marine service contracts, shipbuilders and ship repairers); 1–XII Benedict on Admiralty (MB) §§ 181–91 (2006) (discussing maritime contracts, including contracts for the repair of ships (§ 187)). To achieve this objective, Defendant agreed to, *inter alia,* install two new factory built 16V 2000 M91 diesel engines, pay all costs for the removal of the original port and starboard 16V 2000 M90 diesel engines and all accessories, pay all costs for the removal of the gears connected to those engines, pay all

costs for the installation of the two new engines, and pay all costs for the installation of the new gears and accessories for those engines.[5] (SA ¶¶ 1–4).

### ii. This Dispute is not Inherently Local

■ Having established that the settlement agreement is a maritime contract, this Court must clear a second hurdle before applying general federal maritime law to its interpretation. *See Norfolk S. Ry. Co.,* 543 U.S. at 27, 125 S.Ct. 385. "Is this case inherently local?" *Id.* "For not 'every term in every maritime contract can only be controlled by some federally defined admiralty rule.'" *Id.* (quoting *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 313, 75 S.Ct. 368, 99 L.Ed. 337 (1955) (applying state law to maritime contract for marine insurance because of state regulatory power over insurance industry)). "A maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law." *Id.* (citing *Kossick,* 365 U.S. at 735, 81 S.Ct. 886).

The Eleventh Circuit has summarized the task that a court must undertake when deciding whether to apply state law in an admiralty case. *See Steelmet, Inc. v. Caribe Towing Corp.,* 779 F.2d 1485, 1488 (11th Cir.1986). The court explained:

> One must identify the state law involved and determine whether there is an admiralty principle with which the state law conflicts, and, if there is no such admiralty principle, consideration must be given to whether such an admiralty rule

---

**5.** The settlement agreement contains maritime and non-maritime obligations. *(Compare* SA ¶¶ 1–5, 9, 11–13 (maritime), *with* SA ¶¶ 6–8, 10, 14–15 (non-maritime)). The non-maritime obligations are incidental and not separable from the entire contract. Therefore, admiralty jurisdiction encompasses the entire settlement agreement. *See, e.g., Lucky-*

*Goldstar Int'l (Am.), Inc. v. Phibro Energy Int'l,* 958 F.2d 58, 59–60 (5th Cir.1992); *Kuehne & Nagel (AG & Co) v. Geosource, Inc.,* 874 F.2d 283, 290 (5th Cir.1989); *Keyser v. Blue Star S.S. Co.,* 91 F. 267, 270–72 (5th Cir.1899); *Terra Nova Ins. Co. v. Acer Latin Am., Inc.,* 931 F.Supp. 852, 855–56 (S.D.Fla. 1996).

should be fashioned. If none is to be fashioned, the state rule should be followed. If there is an admiralty-state law conflict, the comparative interests must be considered—they may be such that admiralty shall prevail, as in *Kossick*, or if the policy underlying the admiralty rule is not strong and the effect on admiralty is minimal, the state law may be given effect, as in *Olympic Towing*.

*Id.* (citations omitted). Thus, with respect to the settlement agreement's interpretation, the parties in this case were obligated to identify a particular state rule of contract interpretation to determine whether there is an admiralty rule with which the state rule conflicts.

The parties, however, have not articulated any specific state interest at stake regarding the settlement agreement's interpretation. Indeed, they have not even raised this issue in their respective memoranda of law. This Court has not been able to identify any competing state and federal interests regarding the rules of contract interpretation. Here, the touchstone "is a concern for the uniform meaning of maritime contracts." *Norfolk S. Ry. Co.,* 543 U.S. at 28, 125 S.Ct. 385. Accordingly, the Court will apply general federal maritime law to the settlement agreement's interpretation. *See id.* at 27–29, 125 S.Ct. 385; *Kossick,* 365 U.S. at 738–42, 81 S.Ct. 886.

**B. The Primary Rules of Contract Interpretation under General Federal Maritime Law, and Common Law Rules and Doctrines Impacting the Interpretation and Construction of a Maritime Contract**

"Drawing from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *E. River S.S. Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 864–65, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (footnote omitted). It should, therefore, not come as a surprise to learn that general federal maritime law has adopted the general rules of contract interpretation and construction. *See, e.g., United States ex rel. E. Gulf, Inc. v. Metzger Towing, Inc.,* 910 F.2d 775, 779 (11th Cir.1990); *Cashman Equip. Corp. v. M/V GODFATHER,* No. 05–6271, 2007 WL 934537, at * 2 (E.D.La. Mar. 23, 2007); *cf.* 11 RICHARD A. LORD, WILLISTON ON CONTRACTS §§ 30:1 to 32:20 (4th ed.2006) (discussing rules applicable to the interpretation of a promise, agreement or term thereof).

Before summarizing the rules of interpretation, it is important to understand the distinction between "interpretation" and "construction." Richard A. Lord, author of the treatise *Williston on Contracts,* explains:

The word "interpretation" is used with respect to the language chosen by the parties to manifest their intent; it is the process of applying the appropriate standards to words the parties have used in their agreement in order to determine the meaning of the words. "Construction," on the other hand, involves the court determining, as a matter of law, not the sense of the words or symbols, but the legal meaning of the entire contract; the word is rightly used whenever the import of the writing is made to depend upon a special sense imposed by law. In short, interpretation involves ascertaining the meaning of contractual words, while construction involves deciding their legal effect. Thus, interpretation of the contractual language is the first step towards proper contract construction—the process which occurs when a court determines the legal effect an agreement will have. As understood in this sense, "construction" is necessarily a question of law, while "interpretation" may be a question

of law or fact depending on whether the language of the contract is ambiguous or otherwise requires resorting to extrinsic evidence.

11 LORD, *supra,* § 30:1 (footnotes omitted).

When applying the rules of interpretation to ascertain the meaning of a maritime contract or a term thereof, a number of issues can arise depending on the specific facts and circumstances of each case. The law is fairly clear regarding the primary rules implicated in this case, which are summarized below.[6] This discussion also includes a summary of common law rules and doctrines which, although not technically rules of interpretation, are closely related and, therefore, impact the interpretation and construction of a maritime contract.

### 1. The Primary Rules of Contract Interpretation

"It is a generally accepted proposition that where the terms of a writing are plain and unambiguous, there is no room for interpretation, since the only purpose of judicial construction is to remove doubt and uncertainty." 11 LORD, *supra,* § 30:4. "However, this formulation may be technically overbroad, in the sense that the interpretation of a contract requires an initial determination of whether the contract in ambiguous, either as written or as a result of an ambiguity arising during performance of agreement, and this determination itself involves an assessment of the contract's meaning." 11 *id.* § 30:4 (footnotes omitted).

■■■ The determination of whether a contract is ambiguous is a question of law for the court. *See East v. Premier, Inc.,* 98 Fed. Appx. 317, 319 (5th Cir.2004); *Atl. Dry Dock Corp. v. United States,* 773 F.Supp. 335, 338 (M.D.Fla.1991). It is important to note, however, that a maritime contract is not ambiguous merely because one of the parties disputes its proper interpretation. *See Atl. Dry Dock Corp.,* 773 F.Supp. at 338.

■■■ The primary purpose and function of a court in the interpretation of a maritime contract is to ascertain the intention of the parties. *See, e.g., Premier, Inc.,* 98 Fed.Appx. at 319–20. *See generally* 11 LORD, *supra,* §§ 30:2, 32:2 (same). "[Courts] look to the contract as a whole to determine whether it unambiguously states the parties' intentions." *Sander v. Alexander Richardson Invs.,* 334 F.3d 712, 716 (8th Cir.2003); *accord Cashman Equip. Corp.,* 2007 WL 934537, at *2. If a court can ascertain the parties' intent, it will give effect to it and interpret the contract and terms thereof accordingly. *See O'Brien v. Miller,* 168 U.S. 287, 297–300, 18 S.Ct. 140, 42 L.Ed. 469 (1897) ("The elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them.").

"The parties' language will be deemed conclusively indicative of their intentions where it is reasonably susceptible to only one interpretation." 11 LORD, *supra,* § 32:2. "Conversely, the language will be deemed ambiguous where it is reasonably

---

**6.** The rules of interpretation are sometimes divided into two classes, primary and secondary. *See, e.g.,* 11 LORD, *supra,* § 32:1. It only becomes necessary to resort to the secondary rules of interpretation if, after application of the primary rules, "the meaning of the contract may still be unclear." 11 *id.* § 32:8. For the reasons discussed below, it is unnecessary to apply the secondary rules in this case. *See generally* 11 *id.* §§ 32:9 to:20 (discussing the secondary rules of interpretation). Therefore, they have not been summarized in this discussion.

susceptible to more than one interpretation." 11 *id.* § 32:2; *see also Premier, Inc.,* 98 Fed.Appx. at 319; *Atl. Dry Dock Corp.,* 773 F.Supp. at 337–38. Stated differently, a contact or term thereof is ambiguous if, after applying established rules of interpretation, the written document "remains reasonably susceptible to at least two reasonable but conflicting meanings." 11 LORD, *supra,* § 30:4.

■ "Under federal maritime law, a court 'may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous.'" *Metzger Towing, Inc.,* 910 F.2d at 779 (quoting *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 332–33 (5th Cir. Unit A 1981)); *accord Hicks v. Ocean Drilling & Exploration Co.,* 512 F.2d 817, 825 (5th Cir. 1975), *abrogated on other grounds, Johnson v. Odeco Oil & Gas Co.,* 864 F.2d 40, 42–43 (5th Cir.1989); *see also Lowber v. Bangs,* 2 Wall. 728, 69 U.S. 728, 736–37, 17 L.Ed. 768 (1864). Thus, when a maritime contract is unambiguous on its face, the parties' intent must be gathered from the instrument itself without reference to extrinsic evidence. When a maritime contract is ambiguous, a factual question is presented to the meaning of its provisions and "the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning." 11 LORD, *supra,* § 30:7 (footnotes omitted).

■ In the absence of some contrary indication, words are given their plain, ordinary and everyday meaning as understood by a reasonable person. *See Sander,* 334 F.3d at 716; *Atl. Dry Dock Corp.,* 773 F.Supp. at 338. "Each provision of a contract must be read in light of others so as to give the meaning reflected by the contract as a whole." *Cashman Equip. Corp.,* 2007 WL 934537, at *2. To the

extent possible, every word, term or phrase of a maritime contract must be given effect and should be interpreted without rendering any of them meaningless or superfluous. *See, e.g., Am. Roll–On Roll–Off Carrier, LLC v. P & O Ports Baltimore, Inc.,* 479 F.3d 288, 293 (4th Cir.2007); *Chembulk Trading LLC v. Chemex Ltd.,* 393 F.3d 550, 555 (5th Cir.2004); *Premier, Inc.,* 98 Fed.Appx. at 319; *Cashman Equip. Corp.,* 2007 WL 934537, at *2.

**2. Common Law Rules and Doctrines Impacting the Interpretation and Construction of a Maritime Contract**

**a. The Ancient Maxim *Noscitur a Sociis***

■ The ancient maxim *noscitur a sociis* is a "cannon of construction holding that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." BLACK'S LAW DICTIONARY 1084 (7th ed.1999); *see also* 11 LORD, *supra,* § 32:6. In general, it is "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth" to contract provisions. *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961). This maxim has already been recognized or applied in admiralty cases and, therefore, may be applied when interpreting a maritime contract. *See, e.g., The Three Friends,* 166 U.S. 1, 60, 17 S.Ct. 495, 41 L.Ed. 897 (1897) (discussing the decision in *Nesbitt v. Lushington,* 4 Term R. 783, where the maxim *noscitur a sociis* was applied to a maritime insurance policy); *United States v. Rodgers,* 150 U.S. 249, 278, 14 S.Ct. 109, 37 L.Ed. 1071 (1893) (Gray, J., dissenting) (applying the maxim *noscitur a sociis* to interpret a penal statute within the admiralty jurisdiction of the United States).

### b. The Supplying of an Omitted, Essential Term

■ "Under 'general principles of contract law,' a failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction." *Dobson v. Hartford Fin. Servs. Group, Inc.*, 389 F.3d 386, 399 (2d Cir.2004). "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981).

### b. The Implied Covenant of Good Faith and Fair Dealing

■ Every maritime contract imposes an obligation of good faith and fair dealing between the parties in its performance and enforcement. *See, e.g., Flores v. Am. Seafoods Co.*, 335 F.3d 904, 913 (9th Cir.2003); *Misano di Navigazione, SpA v. United States*, 968 F.2d 273, 274–75 (2d Cir.1992). *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 205 (discussing the duty of good faith and fair dealing). "The duty embraces, among other things, an implied obligation that neither party shall do anything to injure or destroy the right of the other party to receive the benefits of the agreement." 23 LORD, *supra*, § 63:22.

■ "As a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." 23 *id.* § 63:22. "This is so even where the contractual provision at issue is one that purports to grant to the defendant absolute discretion to take certain actions or engage in certain conduct under the contract; such a provision, stated simply, permits the defendant substantial latitude, and as long as the discretion is exercised as permitted under the contract, and without evident bad faith motive or malice, its exercise cannot be a breach of the more general implied promise of good faith and fair dealing." 23 *id.* § 63:22.

### d. The Parol Evidence Rule

The parol evidence rule, despite its name, is not a rule of interpretation or construction, and is not a rule of evidence. *See, e.g., Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988); *see also* 11 LORD, *supra*, § 33:2. It is a substantive rule of contract law. *See Garza*, 861 F.2d at 26. In admiralty, the parol evidence rule is generally stated as follows:

> When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

6–26 Corbin on Contracts (MB) § 573 (2006); *accord Garza*, 861 F.2d at 26; *Har–Win, Inc. v. Consol. Grain & Barge Co.*, 794 F.2d 985, 987 (5th Cir.1986); *Battery S.S. Corp. v. Refineria Panama, S.A.*, 513 F.2d 735, 738 (2d Cir.1975).

"The parol evidence rule aims to ensure some measure of stability in commercial relations." *Garza*, 861 F.2d at 26. "The purpose and essence of the rule is to avoid the possibility that fraud might be perpetrated if testimony as to subjective intent could be substituted for the plain meaning of a contract." *Id.* "In the absence of ambiguity, the effect of admitting extrinsic evidence would be to allow one party 'to substitute his view of his obligations for those clearly stated.'" *Id.* at 26–27 (quot-

ing *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y. 1968)). "However, when the obligations are not clearly stated—when they are ambiguous—the parol evidence rule does not prevent the introduction of extrinsic evidence to aid in interpretation of the contract." *Id.* at 27. "The rule excludes 'only evidence of prior understandings and negotiations which contradicts the unambiguous meaning of a writing which *completely* and *accurately* integrates the agreement of the parties.' " *Id.* (quoting *Battery S.S. Corp.*, 513 F.2d at 739–40 (emphasis in original)). "When extrinsic evidence is considered for the purpose of interpretation, the parol evidence rule is inoperative." *Garza*, 861 F.2d at 27. "Then, the evidence is not considered to vary or contradict the terms of an integrated agreement; rather, the parol is used to determine what the terms of the agreement are." *Id.*

### C. Burdens of Proof

▪ Because Plaintiffs' motion to enforce the settlement agreement is similar to a breach-of-contract action, it is important to briefly discuss the parties' respective burdens of proof on the claims and defenses presented herein. "The law is settled in admiralty actions that plaintiffs must prove their claims by a preponderance of the evidence, whether direct or circumstantial." *Witco Chem. Corp. v. M/V Miss Carolyn*, 426 F.Supp. 373, 375 (W.D.La.1977); *cf.* 2 Am. Jur.2d *Admiralty* § 214 (2007) ("In admiralty, the party who has an affirmative issue has the burden of proving it, in the absence of an admission obviating the necessity of proof.").

The elements of a breach-of-contract claim are: (1) a valid contract; (2) a material breach; and (3) damages. *See, e.g.,* 17A Am. Jur.2d *Contracts* § 707 (2007). An anticipatory repudiation is a breach of contract. *See* 23 Lord, *supra*, § 63:28.

"An 'anticipatory breach' of a contract is one committed before the time when there is a present duty of performance and results from words or conduct indicating an intention to refuse performance in the future." 23 *id.* § 63:29. "It consists of an outright refusal by a party to perform a contract or its conditions, or at least of some manifestation by one party to the other that the first cannot or will not perform some of its obligations under the contract." 23 *id.* § 63:29.

If a party claims that a contract or term thereof is ambiguous, the burden is upon that party to show the necessary indefiniteness of meaning. *See* 11 *id.* § 30:5. Similarly, "since there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." 23 *id.* § 63:22. In the case at bar, the parties each have the burden of proof on their respective claims that the other party has breached the settlement agreement.

### D. Interpretation of the Settlement Agreement's Disputed Terms, and Ascertainment of the Parties' Intent

The primary task in the interpretation of the settlement agreement is to ascertain the intention of the parties. The parties' intent must be gathered from the instrument itself without reference to extrinsic evidence unless the settlement agreement is ambiguous. *See Metzger Towing, Inc.*, 910 F.2d at 779.

Plaintiffs argue, without reference to any particular word, term or phrase of the settlement agreement, that the clear language of the settlement agreement obligates Defendant "to pay all costs of installation **without any limit** as to the amount of cost or scope of work that they will or will not pay for to install the engines." (DE 102 at 18 [emphasis added] ). Specifi-

cally, they ask this Court to find that Defendant "is obligated to pay for all the costs of installing the new engines in Plaintiffs' vessel, including whatever modifications to the exhaust systems, propellers or other [systems or] components that may be required for the engines and vessel to successfully pass a sea trial and to place the interior and exterior of the vessel cosmetically in a like condition to its current condition." (*Id.* at 25). Plaintiffs also demand that Defendant is obligated to pay "the costs of the engineering analysis and modifications necessary to install the 16V 2000 M91 engines in Plaintiffs' vessel with the ZF 2555 gears; and all equipment, work and cosmetic repairs necessary to complete the installation in accordance with good marine practice." (*Id.* at 40). Finally, Plaintiffs contend that paragraph 9 of the settlement agreement "requires that there be a written agreement between the parties detailing the scope of work to be performed, the shipyard to do the work, and the payment arrangements and that [Defendant] should prepare the first draft of such an agreement." (*Id.* at 28).

The settlement agreement, however, does not specify some or all of the obligations as presented by Plaintiffs. Their interpretation of the settlement agreement is primarily based on extrinsic evidence. Because Plaintiffs are resorting to extrinsic evidence, they are in essence arguing that the settlement agreement is ambiguous. Specifically, they contend that the settlement agreement, as a whole, is ambiguous regarding the amount of costs or scope of work that Defendant is obligated to pay to install the new engines, gears and accessories.[7] Plaintiffs also claim that paragraph 9 of the settlement agreement

is ambiguous regarding the obligation to prepare a written agreement.

In support of their alternative interpretations, Plaintiffs offered the following extrinsic evidence in the form of antecedent understandings and negotiations, subjective meaning and intent, usage of trade and course of performance: (1) the testimony of Brian Howe, Scott Woodruff, Lee Swanger, Gerald Abrams and Richard Learned; (2) the deposition transcripts of Brian Howe and Ulrich Kemnitz; and (3) miscellaneous correspondence and other documentary evidence. (DEs 82–86, 95, 99, 104). In opposition, Defendant offered the following extrinsic evidence: (1) the testimony of Thomas Schoepel; (2) the deposition transcript of George Cable; and (3) miscellaneous correspondence and other documentary evidence. (DEs 92, 94, 99).

With respect to Plaintiffs' argument that the settlement agreement, as a whole, is ambiguous regarding the amount of costs or scope of work that Defendant is obligated to pay to install the new engines, gears and accessories, Defendant concedes that the term "accessories" is "clearly ambiguous because the parties ascribe alternate constructions of this term." (DE 103 at 21). They argue that the extrinsic evidence demonstrates that the term "accessories" does not include new propellers or modification to the exhaust system, and should be interpreted to mean component parts of engines, such as hydraulic pumps for power steering, alternators, starters, mounts, any special brackets that may be required for something in the application, flanges, fluid drivers for other systems, and stabilizers for power steering. (*See id.* [citing DE 104 at 121–23] ).

---

**7.** As an aside, the Court notes that Plaintiffs previously took the position that "there are no material disputes as to the plain language of the written settlement agreement." (DE 55 at

5). They then conclude that the scope of "accessories" needs to be determined by the Court. (*See id.* at 7).

Defendant flat out rejects Plaintiffs' argument that paragraph 9 of the settlement agreement is ambiguous. (*See id.* at 27–28). Instead, it argues that paragraph 9 only requires the parties to provide a written confirmation of the mutually agreeable shipyard, nothing more.

### 1. The Settlement Agreement, as a whole, is Unambiguous Regarding the Amount of Costs or Scope of Work that Defendant is Obligated to Pay to Install the New Engines, Gears and Accessories

▮ Paragraph 1 of the settlement agreement states:

Detroit Diesel to install [two] new factory built 2000HP [16V 2000 M91 engines], including:

A) All new gears and accessories for engines;

B) All costs for install including all accessories.

(SA ¶ 1). Paragraph 4 of the settlement agreement states: "Detroit Diesel to pay for shipyard cost for removal of engines, and all accessories." (SA ¶ 4). Applying the primary rules of interpretation, the Court concludes that this plain language, with reference to all of the settlement agreement's provisions, is reasonably susceptible to only one interpretation.

The settlement agreement must be understood to mean that Defendant agreed to pay the reasonable costs to repair the M/Y *Lady Jane*, including the shipyard costs for removal of the existing engines, gears and accessories (SA ¶ 4), and all costs for installation of the new engines, gears and accessories (SA ¶ 1). The language in paragraph 1 must be read in conjunction with the language in paragraph 4. If accessories are removed when the engines are removed, common sense suggests that new accessories must or should be installed when the new engines are installed. In other words, if you take

an accessory out of the vessel you must install a new accessory back into the vessel. When viewed in this context, and as a matter of interpretation, Defendant's promise to install and pay for all new "accessories" is limited to (i) the costs or scope of work to replace the accessories that are removed when the engines and gears are removed, and (ii) the costs of any other minor fitting or attachment necessary to complete the installation of the new engines and gears.

The ancient maxim *noscitur a sociis* lends additional support to the Court's narrow interpretation. The meaning of the general phrase "accessories for engines" is controlled by the specific clause "Detroit Diesel to install [two] new factory built 2000HP [16V 2000 M91 engines]." Applying the maxim *noscitur a sociis* to the phrase "accessories for engines" avoids giving it an unintended breadth.

Finally, the *Oxford English Dictionary* defines the word "accessory" to mean, *inter alia*, "minor fittings or attachments for a motor-car, etc." OXFORD ENGLISH DICTIONARY (2d ed.1989). When this definition is used in the context of an engine, the word "accessories" or the phrase "accessories for engines" means the "minor fittings or attachments" for an engine.

The Court's conclusion above holds true notwithstanding Plaintiffs' alternative interpretation and the extrinsic evidence proffered in support thereof. The plain language of the settlement agreement does not specify that Defendant must pay all costs to modify the M/Y *Lady Jane's* exhaust system. It does not specify that Defendant must pay all costs to install new propellers. It does not specify that Defendant must pay all costs for other systems or components that may be required for the engines and vessel to successfully pass a sea trial and to place the interior and exterior of the vessel cosmetically in a like

condition to its current condition. And it certainly does not specify that Defendant must pay all costs of the engineering analysis and modifications necessary to install the 16V 2000 M91 engines in Plaintiffs' vessel with the ZF 2555 gears, and all equipment, work and cosmetic repairs necessary to complete the installation in accordance with good marine practice. If this Court were to adopt Plaintiffs' interpretation, it would not only rewrite the contract, but would possibly render the settlement agreement too indefinite for enforcement. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 33 (discussing rule applicable to certainty of terms); 1 LORD, supra, §§ 4:18, 4:23 (discussing certainty or definiteness of offers, including offers indefinite as to work or property to be given). For example, would Defendant be in breach of the settlement agreement if they refuse to pay for the modification of the vessel's fuel system, the resurfacing of its hull, or any other work in which Plaintiffs, at their fancy, deem necessary for the engines and vessel to pass a sea trial? This would be unreasonable and create a quagmire of never-ending litigation. Simply stated, the interpretation urged by Plaintiffs would strain the contract language beyond the ordinary and reasonable meaning. *See Premier, Inc.,* 98 Fed.Appx. at 319–21; *Atl. Dry Dock Corp.,* 773 F.Supp. at 337–38; 11 LORD, *supra,* § 30:4. Accordingly, the Court concludes that the settlement agreement, as a whole, is unambiguous regarding the amount of costs or scope of work that Defendant is obligated to pay to install the new engines, gears and accessories.

### 2. Paragraph 9 of the Settlement Agreement is Unambiguous

Paragraph 9 of the settlement agreement states: "Installation of engines and gears and removal of engines and gears to be performed at a mutual agreeable shipyard(s) by the parties in writing." (SA ¶ 9). Applying the primary rules of interpretation, the Court concludes that this plain language, with reference to all of the settlement agreement's provisions, is reasonably susceptible to only one interpretation. Paragraph 9 must be understood to mean that the parties agreed to evidence the selection of a "mutual agreeable" shipyard in written form, nothing more.

This conclusion holds true notwithstanding Plaintiffs' alternative interpretation and the extrinsic evidence proffered in support thereof. The plain language of paragraph 9 does not specify which party must prepare the writing. It does not specify that the parties must prepare a detailed scope of work to be performed on the M/Y *Lady Jane.* And it does not specify that the parties must identify the payment arrangements. Plaintiffs' interpretation would involve considerable revision of the language in the settlement agreement. Accordingly, because Plaintiffs' alternative interpretation would be unreasonable, the Court concludes that paragraph 9 of the settlement agreement is unambiguous. *See Premier, Inc.,* 98 Fed.Appx. at 319–21; *Atl. Dry Dock Corp.,* 773 F.Supp. at 337–38; 11 LORD, *supra,* § 30:4.

### 3. Defendant's Objections Regarding Extrinsic Evidence are Sustained

Based on the foregoing conclusions, the Court declines to consider extrinsic evidence of intent and meaning. Moreover, the Court concludes that the settlement agreement is a binding, fully integrated written contract. Indeed, at no point in this dispute have the parties taken a contrary position. (DEs 45 at 5; 48 at 2; 55 at 1–4; 56 at 3; 102 at 13–16; 103 at 4). Because the parties intended this writing to be the final expression of their agreement, the parol evidence rule bars the admission of extrinsic evidence of antecedent understandings and negotiations to

vary or contradict the settlement agreement. Accordingly, Defendant's objections directed to all such evidence, parol or otherwise, are sustained. (*See, e.g.,* DEs 89, 100).

### 4. The Parties' Intent

■■■ Having established that the settlement agreement is unambiguous, this Court must ascertain the parties' intent from the instrument itself. *See, e.g., Metzger Towing, Inc.,* 910 F.2d at 779. Upon review of the entire settlement agreement, including the circumstances surrounding the execution of the contract,[8] the Court finds that the parties' intent was to put Plaintiffs in the same position they would have been had the M/Y *Lady Jane's* port engine not failed to produce the guaranteed, specified engine power output. In other words, the intention of the parties was to make Plaintiffs whole to the extent that it was possible to measure their loss or injury in terms of money, including the reasonable costs to repair the M/Y *Lady Jane* and the reasonable attorney's fees, expert technical fees and costs incurred by Plaintiffs in an attempt to resolve the dispute.

### E. The Settlement Agreement has not been Materially Breached by Defendant or Plaintiffs

In support of their motion to enforce the settlement agreement, Plaintiffs allege the following breaches by Defendant: (1) Defendant failed to acknowledge that their agreement to pay all the costs for installing the 16V 2000 M91 engines in the M/Y *Lady Jane* included an obligation to pay the cost of modifying the exhaust and/or propellers as necessary to properly operate with the engines; (2) Defendant, having failed to complete a proper engineering

analysis of the installation of the 16V 2000 M91 engines, including a determination of the proper exhaust system, propellers, engine installation and reduction gears, unilaterally decided to install Twin Disc 6598 gears with the 16V 2000 M91 engines which may not be adequate or suitable for use with such engines; (3) Defendant failed to act with due diligence and reasonable promptitude to order the 16V 2000 M91 engines, provide a written agreement and scope of work, and take other reasonable actions required to affect the engine installation so as to allow the work to proceed on the agreed date of August 1, 2006; and (4) Defendant failed to timely reimburse Plaintiffs for the attorney's fees, expert technical fees and costs incurred in the underlying litigation. (DE 102 at 6).

Defendant alleges the following breaches by Plaintiffs: (1) Plaintiffs failed to provide notice, in writing, of an agreed shipyard for the installation of engines, gears and accessories; (2) Plaintiffs failed to deliver the M/Y *Lady Jane* to the Cable Marine shipyard, despite Defendant's request to do so; and (3) Plaintiffs failed to execute a reasonable confidentiality agreement. (DE 103 at 3). Defendant, however, does not seek money damages. It merely argues that Plaintiffs' failure to take the M/Y *Lady Jane* to Cable Marine for repairs precludes their right to seek specific performance against Defendant for any alleged material breach of the settlement agreement. The undersigned will address each alleged breach in turn below.

### 1. The Court must Supply an Omitted, Essential Term to the Settlement Agreement

Before doing so, the undersigned notes that Plaintiffs face an uphill battle in light

---

**8.** *Cf.* 11 LORD, *supra,* § 32:7 (explaining that "the circumstances surrounding the execution of a contract may always be shown and are always relevant to a determination of what the parties intended by the words they chose").

of the conclusions above because a majority, if not all, of their arguments in support of breach are based on an interpretation of the settlement agreement in light of extrinsic evidence of meaning, intent, and antecedent understandings and negotiations. They do not interpret the settlement agreement within its four corners under the assumption that it is unambiguous. Indeed, it is hard to decipher many of Plaintiffs' arguments because they often times fail to identify which paragraph or paragraphs they allege have been breached by Defendant.

Defendant, indirectly, points out an obvious flaw with the settlement agreement, further compounding the problem. It is missing an essential term. The parties, when drafting the settlement agreement, forgot to insert a provision wherein Plaintiffs promised to deliver the M/Y *Lady Jane* to the shipyard for repairs once a shipyard was agreed upon in writing.[9] This term, which is reasonable under the circumstances, is essential to a determination of the parties' rights and duties because it is, without question, a condition precedent to Defendant's promise to (i) commence installation after July 31, 2006, (ii) pay for shipyard cost for removal of engines, and all accessories, (iii) install two new factory built 16V 2000 M91 engines, including all new gears and accessories, and (iv) pay for all costs for install, including new gears and accessories. Plaintiffs' obligation to deliver the M/Y *Lady Jane* is also a condition precedent to paragraph 3 of the settlement agreement, which grants Defendant two months to install and test the new 16V 2000 M91 engines. Therefore, the Court concludes that it must supply the following omitted, essential term to the settlement agreement: After the parties select a mutual agreeable shipyard in writing, Plaintiffs agree to deliver the M/Y *Lady Jane* to the shipyard for repairs within a reasonable time, allowing reasonable additional time (if necessary) due to unknown or uncontrollable circumstances such as lack of available dockage for the vessel, lack of available manpower to perform the repairs, acts of third parties or acts of god. *See* RESTATEMENT (SECOND) OF CONTRACTS § 204.

### 2. Defendant did not Commit an Anticipatory Breach of the Settlement Agreement by Refusing to Pay All Costs of Installation without any Limit as to the Amount of Cost or Scope of Work, Including the Costs of Modifying the Exhaust System and Installing New Propellers

■ Plaintiffs allege that Defendant breached the settlement agreement when it failed to acknowledge that their agreement to pay all the costs for installing the 16V 2000 M91 engines in the M/Y *Lady Jane* included an obligation to pay the cost of modifying the exhaust and/or propellers as necessary to properly operate with the engines. (DE 102 at 6, 18–25). Defendant argues that the term "accessories" in paragraphs 1 and 4 is not defined to include new exhaust and propellers and, therefore, it did not commit an anticipatory breach of the settlement agreement by declining to pay for propellers and exhaust as part of the engine and gear installation. (DE 103 at 7–11, 19–24).

The Court can construe Plaintiffs' first contention in one of two ways. On one

---

9. Defendant argues that Plaintiffs are in default of their obligations under the settlement agreement because they have "declined to move the vessel into the shipyard for repairs." (DE 103 at 15). Defendant also claims that, despite Defendant's notice that it is ready, willing and able to begin the repower, Plaintiffs failed to take the M/Y *Lady Jane* to Cable Marine for repairs. (*See id.* at 31–23).

hand, Plaintiffs allege that Defendant committed an anticipatory breach of paragraphs 1 and 4 of the settlement agreement by refusing to pay all costs of installation without any limit as to the amount of cost or scope of work, including the costs of modifying the exhaust system and installing new propellers. On the other hand, Plaintiffs appear to also allege that Defendant committed an anticipatory breach of the settlement agreement by promising to install 16V 2000 M91 engines, where both parties were generally aware that they would produce more exhaust than the 16V 2000 M90 engines, but refusing to modify the M/Y *Lady Jane's* exhaust system to accommodate the greater volume of exhaust so that the engines and vessel could pass a sea trial, all in violation of the sea trial clause and the implied warranty of workmanlike performance. In other words, Plaintiffs argue that Defendant, when it agreed to install new engines, gears and accessories in the M/Y *Lady Jane,* assumed the responsibility to do whatever is necessary to ensure that the engines and vessel pass a sea trial. Out of an abundance of caution and for the sake of clarity, the undersigned will address each allegation separately.

At the outset, the Court has already determined, as a matter of interpretation, that Defendant's promise to install and pay for all new accessories does not include an exhaust system or propellers. It is limited to (i) the costs or scope of work to replace the accessories that are removed when the engines and gears are removed, and (ii) the costs of any other minor fitting or attachment necessary to complete the installation of the new engines and gears. Plaintiffs' contentions are based on an interpretation of the settlement agreement in light of extrinsic evidence of meaning, intent, and antecedent understandings and negotiations, and exclusively through the testimony of Gerald Abrams, Brian Howe, Scott Woodruff, Lee Swanger, and miscellaneous correspondence and other documentary evidence. (DE 102 at 18–25). Because the settlement agreement is unambiguous, the Court declines to consider this evidence. Accordingly, Plaintiffs' first allegation that Defendant committed an anticipatory breach of paragraphs 1 and 4 of the settlement agreement fails as a matter of law.

■ Turning now to Plaintiffs' second allegation, the question presented is whether anything else obligates Defendant to assume the responsibility to do whatever is necessary to ensure the engines and vessel pass a sea trial, such as the sea trial clause, and the implied warranty of workmanlike performance, usage of trade or course of dealing. As a general rule, there is implied in every maritime contract for work or services a duty to perform with reasonable care, skill and diligence, and in a workmanlike manner. *See* 1 SCHOENBAUM, *supra,* § 5–8. This, of course, is known as the implied warranty of workmanlike performance. *See Alcoa S.S. Co.,* 383 F.2d at 50; *Houston–New Orleans, Inc.,* 353 F.Supp. at 898. "The standard of the skill required is the degree of skill, efficiency, and knowledge that is possessed by those of ordinary skill, competency, and standing in the particular trade or business for which the person is employed, and where the contract does not provide for a higher degree of skill, only ordinary skill and the degree of skill adequate to the performance of the undertaking is required." 17A AM. JUR.2D *Contracts* § 612. "No breach will be found if the contractor performed the work in accordance with industry standards." *Id.*

■ Usage, which is defined as habitual or customary practice, serves two different functions. *See* 12 LORD, *supra,* § 34:1. It "may give particular meaning to the terms of an agreement" and it "may supplement or qualify the terms of an agree-

ment." 12 *id.* § 34:1; *see* also RESTATE-MENT(SECOND) OF CONTRACTS § § 219–23 (discussing the scope of contractual obligations as affected by usage). "A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." RESTATEMENT (SECOND) OF CONTRACTS § 223(1). "Unless otherwise agreed, a course of dealing between parties gives meaning to or supplements or qualifies their agreement." *Id.* § 223(2). There is generally no requirement that an agreement be ambiguous before evidence of trade usage or course of dealing can be used to establish, supplement or qualify terms or conditions of a contract. *See id.* § 222, cmt. b; *id.* § 223, cmt. b.

After a careful review of all the evidence admitted in this case, including the plain language of the settlement agreement, the parties' intent, usage of trade, and the course of dealing and course of performance between the parties, as well as a review of general maritime principles, the Court concludes that Plaintiffs have failed to satisfy their burden of proof on this second allegation. Brian Howe testified that the standard protocol in the industry after a major repair to the engines of a vessel is to perform a sea trial.(DE 104 at 60). He explained further that when a sea trial is performed, the parties involved basically test the engines to make sure they are properly installed and that they properly perform. (*Id.* at 76). This process includes: (1) inspecting the engines to make sure all of the fittings have been properly adjusted, and that there are no unusual vibrations or leaks; and (2) testing the engines at various RPMs up to full load RPM to ensure that they develop the RPMs that they are supposed to develop. (*Id.* at 61). The ultimate goal is to make sure the engines develop the appropriate power output and RPMs, and function the

way they are supposed to function. (*Id.*). Mr. Howe also testified that, in his experience, when an owner brings his vessel to a shipyard for repairs to an engine, he adds many things to the process, including propeller changes, and "that is just [an] expense that is associated with owners in the normal course of our business." (*Id.* at 81). When asked on direct examination if he understood at mediation that there may be a need to modify the M/Y *Lady Jane's* exhaust system, Mr. Howe responded:

A. Well, not in a specific sense. No more so than it dawned on me that the range of the boat would be affected by having higher horsepower engines, and the fuel tank would only hold a fixed capacity of fuel, and therefore the boat wouldn't go as far. To make more exhaust, it takes more fuel to make it.

There are many things that would be affected by changing engines, and frankly they have to be dealt with by the owner.

(DE 104 at 102–03). On cross examination, Mr. Howe responded to a line of questions regarding his experience in doing installations and repowers of engines. (*Id.* at 129–30). He testified as follows:

Q. With respect to your experience in doing repowers of engines, installations of engines, is there certain items on a boat that need to be modified or adjusted sometimes when there is a repower or installation of a new engine?

. . .

THE WITNESS: My experience is quite often owners have additional yard type work completed during the down time of major work, engine replacement, like an engine replacement.

. . .

Q. And what type of work would this be?

A. Anything from painting to fiberglass work, bottom work, propeller

work, shaft alignments, you name it. Heavy yard work.

Q. In your experience that is something that is generally taken care of by the customer; is that correct?

A. It is never taken care of by me, it is always somebody else's bill.

(*Id.*). Finally, Mr. Howe explained that Defendant never supplies exhaust systems or propellers. (*Id.* at 123–24).

Scott Woodruff, when asked if he knew whether there would be a problem with the propellers and exhaust after the Defendant installed the 16V 2000 M91 engines and Twin Disc 6598 gears, responded:

A. No. . . . The exhaust system as [Mr. Howe] clearly explained is a matter of tweaking once the installation is complete. That is common with ship builders, they run a system package in the new installation, measure the exhaust flow rates, and make modifications to the exhaust system during the shake down cruise of the boat. They call up the exhaust system supplier and make a change. That is not unusual.

As far as the propellers, the propellers that exist today, there is not a problem with them, they are just not going to pull all of the torque from the engine that the engine is generating.

Q. Are you talking about the propellers installed on Mr. Abrams' vessel currently?

A. Yes.

Q. Those are Time Ridge propellers?

A. I am not sure if that is what is on the boat or not.

Q. Continue.

A. The propeller is not an issue from the technical standpoint. It is [an] optimization discussion. There are operators and owners out there that prefer propellers that don't [optimize] the torquing. They can add extra weight for

the boat for whatever reason and still have margin with the engine RPMs.

Q. So in your experience, in your professional experience with Detroit Diesel, when you guys offer to repower a boat, whether it is swap 18 to 18 or 18 to 2000, is it ever common for you guys to get involved with propellers and exhaust?

A. No.

Q. With the upgraded engine horsepower, isn't it true there are other portions of the vessel that are also affected?

A. Yes.

Q. What are those?

A. The propeller shaft's diameter, for instance. The air system, intake flow into the engine room, potentially the fuel line, supply fuel line capacity. Those are some examples that I can think of off the top of my head.

Q. The fuel tanks?

A. Again, it is an optimization concept. Do you want the boat range to be the same with an engine that is going to burn more fuel at different cruise points. And if you want the range of the boat the same, you may consider changing the fuel tanks.

That is something we do see owners will do once the boat is in a shipyard as they make modifications to the boat while the work is going on. They sort of pile everything together while the ship is out of service.

(DE 104 at 168–70). Mr. Woodruff explained further that propellers can either be generic or unique, depending on "the objectives and goals of the operator." (*Id.* at 175). He testified that propellers are unique if an operator wants to "optimize the performance of the power package." (*Id.*). Mr. Woodruff also testified that Defendant does not work with engine distributors or vessel manufacturers to determine the appropriate size exhaust for an

engine manufactured by Detroit Diesel. (*Id.* at 148–49). He explained:

Q. Does Detroit Diesel work with the manufacturers and engine distributors to determine what the appropriate size exhaust are for your engines?

A. No. We give them a specification, and [they] use that specification and go to an outside exhaust manufacturer.

Q. You have certain requirements by way of specifications that you provide to them that have to be met by the exhaust system in order for the exhaust to function, correct?

A. The way we work, these are guidelines that the engine—we set out these technical guidance documents that help manufacturers size the systems that support the engines appropriately.

Whether the size of those systems using solution A, B, or C, we don't care. We just say this is what the engine needs for a solid functioning installation.

[It doesn't] necessarily speak to the functionality of the vessel.

(*Id.*). Plaintiffs failed to introduce any contrary testimony.

Simply stated, Plaintiffs have not sustained their burden to show that a yacht engine manufacturer assumes the responsibility to do whatever is necessary to ensure the engines and vessel pass a sea trial when they agree to perform an engine repair or repower. First, the plain language of the settlement agreement fails to demonstrate that the parties intended to transfer this obligation to Defendant. For example, the parties specifically listed the engines and gears, but nothing else in the vessel's powertrain—*e.g.,* drive shaft or propellers. If Plaintiffs wanted Defendant to assume this responsibility, they should have included that obligation in the settlement agreement.

Second, the evidence of usage fails to demonstrate that the words employed in the settlement agreement, while unambig-uous on their face, "have acquired by usage of trade a peculiar and different meaning with reference to the general dealing of the trade or profession, and that they were so used" therein. 12 LORD, *supra,* § 34:1. In the context of an "original" or "virgin" installation, a yacht engine manufacturer normally does not provide an exhaust system or propellers to ensure the engines and vessel pass a sea trial. The evidence demonstrates that a vessel manufacturer reviews the engine's specifications and then, after consulting with an exhaust manufacturer, selects the appropriate size of the exhaust system that would support the engine. The evidence also demonstrates that a vessel owner selects and purchases the appropriate propellers depending on their goals and objectives regarding the vessel's overall performance. There is nothing in the record showing that this prevailing custom or industry standard between a yacht engine manufacturer and a vessel owner is treated differently in the context of an engine repair or repower.

Third, Plaintiffs also failed to proffer sufficient evidence demonstrating that usage of trade or course of dealing should be used to establish, supplement or qualify terms or conditions of the settlement agreement, or the implied warranty of workmanlike performance. Moreover, the Court declines to expand the implied warranty of workmanlike performance beyond its established standard.

Finally, assuming usage of trade could be so used in this case, Plaintiffs failed to show that Defendant had notice or constructive knowledge of the usage. *See generally* 12 LORD, supra, § 34:12 to:17 (explaining the requisites for incorporating custom or usage, including notice or knowledge of usage (§ 34:15)).

### 3. Defendant did not Breach the Implied Covenant of Good Faith and Fair Dealing by Selecting Twin Disc 6598 Gears to be Installed in the M/Y *Lady Jane*

■ Plaintiffs allege that Defendant breached the settlement agreement when, having failed to complete a proper engineering analysis of the installation of the 16V 2000 M91 engines, including a determination of the proper exhaust system, propellers, engine installation and reduction gears, it unilaterally decided to install Twin Disc 6598 gears with the engines (instead of ZF 2555 gears) which may not be adequate or suitable for use with such engines. (DE 102 at 6, 28–34). Specifically, Plaintiffs "object to the action taken by [Defendant] to install two Twin Disc transmissions with the new engines instead of the ZF 2555 transmissions they thought they were to receive" and argue "that the Twin Disc gears are not appropriate for use in a 65–foot Viking with 2000 horsepower engines and constitute a non-standard installation that will adversely affect the market value of their vessel." *(Id.* at 28). They argue "that an engineering analysis by Viking, started but never finished, to determine how to install the new engines with ZF 2555 gears was, in fact, completed, it would establish that the new engines would be installed in their vessel in a manner that would allow the use of ZF gears." *(Id.).* Alternatively, Plaintiffs argue that they should be financially compensated for any loss of market value to the M/Y *Lady Jane* resulting from the use of Twin Disc 6598 gears. *(See id.).* Plaintiffs offered the testimony of Lee Swanger, an expert in mechanical engineering and metallurgy, in support of their position regarding suitability of the gears, and the testimony of Richard Learned, a certified marine surveyor and accredited marine appraiser, in support of their position regarding diminution in market value of the M/Y *Lady Jane.* (DEs 99 at 77–148; 104 at 193–222).

Defendant argues that there is no evidence demonstrating that it unequivocally notified Plaintiffs it would not perform under the terms of the settlement agreement. (DE 103 at 4–7, 19–24). It contends further that the opposite is true because it selected, ordered and obtained Twin Disc 6598 gears, which are adequate and suitable for use with the 16V 2000 M91 engines. *(See id.).* Defendant offered the testimony of Brian Howe, Scott Woodruff and Thomas Schoepel in support of their position. (DEs 99 at 54–190; 104 at 150–191).

The Court construes Plaintiffs' second contention as an allegation that Defendant committed an anticipatory breach of paragraph 1 of the settlement agreement by deciding to install Twin Disc 6598 gears into the M/Y *Lady Jane,* all in violation of the implied covenant of good faith and fair dealing. At the outset, the Court notes that the plain language of paragraph 1 does not specify which party is responsible for selecting the new gears, and it does not specify the manufacturer and model of the gears to be installed in the M/Y *Lady Jane.* As explained in more detail below, the evidence demonstrates that Defendant assumed primary responsibility for selecting the appropriate gears, and Plaintiffs allowed them to do so. The burden of proof is, therefore, on Plaintiffs to show that Defendant acted in bad faith by deciding to install the Twin Disc 6598 gears into the M/Y *Lady Jane. See* 23 Lord, *supra,* § 63:22.

Upon a review of all the evidence admitted in this case, including the plain language of the settlement agreement, the parties' intent, and the course of performance between the parties, the Court concludes that Plaintiffs have failed to satisfy their burden of proof on this allegation. Plaintiffs maintain that ZF gears should

be installed in the M/Y *Lady Jane* because Viking currently couples the 16V 2000 M91 engines with ZF gears. (DE 102 at 29–30). Mr. Howe testified that an engine supplied by the Detroit Diesel factory can come with or without a gear and there is no "standard package." (DE 104 at 67). At the time of mediation in November 2005, Viking Yachts paired the 16V 2000 M91 engine with a ZF gear; however, Defendant did not offer a "standard package." *(Id.* at 68–69). Indeed, Mr. Howe testified that in November 2005, all different marine gear ratios and different manufacture marine gears were supplied with Detroit Diesel engines. *(Id.* at 68). Mr. Howe attempted to find the ZF/M91 package similar to Viking's current production for use in the M/Y *Lady Jane. (Id.* at 112). He tried to couple the ZF gears with the 16V 2000 M91 engines to make his life "easier." *(Id.).* Mr. Howe's decision to attempt to use the ZF marine gear with the 16V 2000 M91 engine was based on his knowledge that Viking was already selling that (engine and gear) combination to current production Viking vessels and thought he could "clone it" for the M/Y *Lady Jane. (Id.).* However, Mr. Howe was unaware that the current Viking production vessels had a hull configuration different than Plaintiffs' vessel which changed the placement of the machinery in the engine room. (DE 104 at 112–13). He believes Viking changed their hull design in production year 2004 or 2005 which is after the date of manufacture of Plaintiffs' vessel. *(Id.* at 113). The current design for Viking 65 foot vessels have a pocket style hull. *(Id.* at 86). The M/Y *Lady Jane* is not a pocket style hull so the engine marine gear configuration was a little bit different. *(Id.).* Defendant received drawings from Johnson & Towers, Inc. and Viking Yachts to evaluate the different gear packages, and compare the specifications for the engines used in the current Viking production vessels with the specifications for the engines used in prior Viking models such as the M/Y *Lady Jane. (Id.* at 155).

Mr. Woodruff testified that, after he reviewed these drawings, he realized modifications would need to be made to the M/Y *Lady Jane* in order to install the ZF gears into the vessel. (DE 104 at 156). After reviewing these modifications, Defendant determined that there were a lot of changes to the billy beams, stringers and bulkheads of the vessel, all changes that are invasive and would affect the structural integrity of the M/Y *Lady Jane. (Id.).* With respect to exactly what would have to be moved or modified, Defendant relied on the information supplied by Viking Yachts. *(Id.).*

Defendant knew there were other less intrusive solutions available for the M/Y *Lady Jane;* therefore, it consulted with Twin Disc, Inc. to obtain Twin Disc's recommendation for an appropriate gear to be paired with the 16V 2000 M91 engine. *(Id.* at 156–57). Twin Disc, Inc. recommended the Twin Disc Model MG–6598DC gear. *(Id.* at 157). Twin Disc, Inc. confirmed that the 2000 horsepower rating of the 16V 2000 M91 engine was acceptable to them for use with the Twin Disc 6598 gear. *(Id.* at 158). Twin Disc, Inc. sent an e-mail and letter to Defendant approving the Twin Disc 6598 gear with the 16V 2000 M91 engine. (DEs 94 [Exs. 19, 55]; 104 at 158). Tom Schoepel, sales manager for Twin Disc, Inc., testified that Twin Disc, Inc. reviewed data and engineering drawings for the Twin Disc 6598 gear and concluded that they "have plenty of strength within the gear to uprate it to stay with that engine rating at the 2000 brake horsepower." [10] (DE 99 at 186).

10. The December 15, 2006 letter from Twin Disc, Inc. contains a calculation error that was addressed by Mr. Schoepel in his direct testimony. Mr. Schoepel testified that the calculation error does not change his opinion

Mr. Schoepel also confirmed that Defendant's proposed gear coupling was not unique. He testified that the Twin Disc 6598 gear had already been paired with Defendant's 2000 horsepower engines. (*Id.* at 159). Forty-six of the Twin Disc 6598 gears have been supplied to Defendant for use on the 2000 horsepower engines. (*Id.*). Moreover, using the Twin Disc 6598 gear in the M/Y Lady Jane would be less intrusive because it is identical in size and weight to the gear already installed in the vessel and would not require structural modifications to the hull.

Plaintiffs proffered that the Twin Disc 6598 gear is an inappropriate match with the 16V 2000 M91 engine because it "will result in a higher probability of failure than the use of the ZF gear box" paired with the 16V 2000 M91 engine. (DE 104 at 207). Lee Swanger opined that the Twin Disc 6598 gear will not "fail immediately," and might not fail at all, within the warranty period; but, the probability of failure is higher because you used up some of the factor of safety Twin Disc, Inc. built into the gear. (*Id.* at 208). Mr. Swanger's sole basis for opining this "probability of failure" theory is his reliance on literature provided by Plaintiffs' counsel and the December 15, 2006 letter from Twin Disc, Inc. Mr. Swanger did not conduct any physical testing to determine the rating of the Twin Disc 6598 gear. (*Id.* at 213). He did not conduct any testing with the Twin Disc 6598 gear and the 16V 2000 M91 engine. (*Id.*). He relies solely on the rating as published in the Twin Disc, Inc. literature despite Mr. Schopel's December 15th letter stating that the guide would be

updated to reflect the current 2000 rating. (DE 94 [Ex. 55]).

Plaintiffs also contend that equipping the M/Y *Lady Jane* with the Twin Disc 6598 gear will cause the vessel to depreciate in value as compared to the vessel equipped with a ZF manufactured gear. (DE 99 at 88, 93, 112). According to Plaintiffs' expert, Richard Learned, the value of the M/Y *Lady Jane* today, without the addition of new engines and gears is approximately $1,030,000, yet the value is unchanged with the addition of brand new 16V 2000 M91 engines with zero engine hours, a five-year warranty and Twin Disc 6598 gears.[11] (*Id.* at 112).

Based on a review of the foregoing evidence, the undersigned cannot concluded that Defendant acted in bad faith by deciding to install the Twin Disc 6598 gear into the M/Y Lady Jane. The Court finds the testimony of Mr. Schoepel, sales manager for Twin Disc, Inc., credible. Mr. Schoepel testified that the Twin Disc 6598 gear is rated for 2000 brake horsepower at 2350 rotations per minute. Moreover, the evidence suggests that it may be impracticable to install the ZF 2555 gear into the M/Y Lady Jane because, to do so, would require additional, invasive modifications to the engine room that would impact the structural integrity of the vessel.

Finally, the undersigned rejects the testimony of Mr. Learned regarding "stigma" damages or diminution in market value of the M/Y *Lady Jane* as too remote and speculative. Even if this evidence was reliable, Plaintiffs would still not be entitled to recover such damages because De-

---

that the Twin Disc 6598 gear is suitable for use with the 16V 2000 M91 engine. (DE 99 at 161–62).

**11.** Defendant cites to the testimony of Stewart Hutcheson in its proposed findings of fact and conclusions of law to counter the testimony of

Mr. Learned. (DE 103 at 6–7). However, the transcript of Mr. Hutcheson's deposition taken on February 14, 2007 has not been filed by Defendant as an exhibit for consideration. Therefore, the Court has not considered Mr. Hutcheson's proposed testimony in rendering this report and recommendation.

fendant exercised the discretion permitted under the settlement agreement without bad faith motive or malice. In other words, because Defendant did not breach the implied covenant of good faith and fair dealing, Plaintiffs are not entitled to recover damages.

### 4. Defendant did not Breach Paragraph 9 of the Settlement Agreement because the Parties' Subsequent Conduct and Oral Representations Establish that Cable Marine is the "Mutual Agreeable" Shipyard

Plaintiffs allege that Defendant breached the settlement agreement by failing to act with due diligence and reasonable promptitude so as to allow the repair work to proceed on the agreed date of August 1, 2006. (DE 102 at 6, 26–28). In support of this overall allegation, they claim Defendant failed to: (1) timely order the 16V 2000 M91 engines; (2) provide a written agreement and scope of work; and (3) take other reasonable actions required to affect the installation. *(Id.* at 6).

Unfortunately, Plaintiffs do not identify, with precision, the paragraphs of the settlement agreement they claim were breached by Defendant. Moreover, Plaintiffs' memorandum containing their proposed conclusions of law discusses only one of the alleged breaches identified above—Defendant's alleged failure to provide a written agreement and scope of work. (DE 102 at 26–28). Thus, based on Plaintiffs failure to sufficiently address other grounds in support of their overall allegation, the Court construes Plaintiffs' third contention as an allegation that Defendant breached paragraph 9 of the settlement agreement by failing to provide a written agreement and scope of work.

Upon a review of all the evidence admitted in this case, including the plain language of the settlement agreement, the Court concludes that Plaintiffs have failed to satisfy their burden of proof on this allegation. The Court has already concluded, as a matter of interpretation, that paragraph 9 must be understood to mean that the parties agreed to evidence the selection of a "mutual agreeable" shipyard in written form, nothing more. Plaintiffs' contentions are based on an interpretation of the settlement agreement in light of extrinsic evidence of meaning, intent, and antecedent understandings and negotiations, and exclusively through the witness testimony and miscellaneous correspondence and other documentary evidence. (DE 102 at 26–28). Because paragraph 9 of the settlement agreement is unambiguous, the Court declines to consider this evidence.

Nonetheless, on July 6, 2006, counsel for Defendant wrote to Plaintiffs' counsel advising of the "description of work" to be conducted to the vessel and stating "Cable Marine is able to do the installation in accord with the parameters set forth above." (DE 94 [Ex. 34]). Mr. Abrams asked George Cable, of Cable Marine, to reserve August 1, 2006 as the date when the M/Y *Lady Jane* would be brought into the shipyard for repair. (DE 91 at pp. 16–17). Mr. Abrams admitted that he told Mr. Howe that he "had no objection to Cable Marine." (DE 99 at 28). Thus, Defendant did not breach paragraph 9 of the settlement agreement because the parties' subsequent conduct and oral representations establish that Cable Marine is the "mutual agreeable" shipyard.

Assuming *arguendo* the other grounds have not been withdrawn, abandoned or waived, the evidence demonstrates that Defendant has not breached the settlement agreement for untimely performance. The plain language of paragraph 2 states: "Detroit Diesel to have [two] calendar months to build engines." It does not specify a

date certain in which Defendant was obligated to start building the 16V 2000 M91 engines. The settlement agreement also does not identify a date certain in which the gears were to be ordered. Paragraph 3 states: "Detroit Diesel to have [two] months to install [and] test new engines." Paragraph 5 states: "Detroit Diesel to commence installation after July 31, 2006." It does not, however, state installation of the engines shall commence on August 1, 2006. Finally, the settlement agreement fails to specify that time is of the essence.

Mr. Howe testified that his objective was to make the arrangements necessary to commence the work as of August 1, 2006. (DE 104 at 93, 133). However, in the February–March time frame, Defendant began "seeing problems" with installing the ZF gear into the M/Y *Lady Jane*. (*Id.* at 155). Mr. Woodruff admitted this was the first time that Defendant would be installing 2000 horsepower engines in a 65 foot Viking with a hull configuration like the M/Y *Lady Jane*, that was designed for 1800 horsepower engines. (*Id.*). Mr. Abrams admitted he was fully aware that Defendant was going to do an engineering analysis on the vessel. (DE 99 at 49). He also admitted that Mr. Howe told him in the middle of March 2006, that Defendant was collaborating with Viking engineers as to whether it was feasible to install the 16V 2000 M91 engines and the ZF gears in the vessel, but that they were having a difficult time getting all of the information they needed. (*Id.* at 30). Mr. Abrams called Bill Heeley at Viking Yachts, whom he had a good relationship, to see if Mr. Heeley could just "prod his people a little bit to help" Defendant move a little faster. (*Id.*). Once it was determined, through review of the documents received from Viking Yachts, that to install the ZF 2555

gears would require modifications to the vessel, Twin Disc 6598 gears were ordered on May 8, 2006. (DE 94 [Ex. 25] ).

On April 17, 2006, Mr. Howe phoned Mr. Abrams and sent an e-mail stating that they selected the Twin Disc 6598 gear for use with the 16V 2000 M91 engine. (*Id.* [Ex. 56] ). On July 6, 2006, Defendant's counsel advised Plaintiffs' counsel that the engines would be received by mid-July 2006 but that the Twin Disc 6598 gears would not be available until the first week of November. (*Id.* [Ex. 34] ). Twin Disc, Inc., and not Defendant, controlled the timing of the manufacture and shipment of the gears. Twin Disc, Inc. estimated that it would take approximately four and a half months from the order date to complete the manufacture of the gears. (DE 56 [Ex. 3] ). Despite Plaintiffs' awareness that the Twin Disc 6598 gears were not received in Florida, Plaintiffs tendered the vessel to Defendant for repair by letter dated August 2, 2006.[12] (DE 94 [Ex. 38] ).

On September 8, 2006, counsel for Defendant informed Plaintiffs' counsel that the engines were built and being stored at Florida Detroit Diesel–Allison in Fort Lauderdale, Florida waiting on arrival of the marine gears. (DE 94 [Ex. 43] ). On October 12, 2006, Defendant's counsel advised Plaintiffs' counsel that the gears have arrived and work could commence on the M/Y *Lady Jane* at Cable Marine anytime between October 18 and October 23, 2006. (*Id.* [Ex. 44] ). Plaintiffs declined to bring the vessel to the shipyard. Although Defendant attempted to begin work as of August 1, 2006, the work was ready to commence anytime between October 18 and October 23, 2006 which is still "after" July 31, 2006 and in accord with

---

12. Although this letter is evidence that Plaintiffs were willing to tender the M/Y *Lady Jane* on August 1, 2006, there is no evidence demonstrating that Plaintiffs actually took the vessel to Cable Marine and tendered possession of the vessel on that date.

the plain language of the settlement agreement.

Defendant offered to make repairs to the vessel within a reasonable time following July 31, 2006. It offered to start the work on October 18 through 23, 2006, approximately three months after July 31, 2006. In fact, Defendant informed Plaintiffs that it would need additional time to begin the repairs because the gears would not be available for installation until the first week of November and that it would attempt to expedite delivery. The gears were expedited and notice was given to the Plaintiffs on October 12, 2006 that they could bring the M/Y *Lady Jane* to Cable Marine to commence repairs. This three-month time frame between July 31, 2006 and October 18, 2006 is not unreasonable.

■ Alternatively, Plaintiffs' unwillingness to tender or deliver actual possession, custody and control of the M/Y *Lady Jane* to either Defendant or Cable Marine prevents this Court from holding Defendant in material breach of the settlement agreement for untimely performance so as to allow the repair work to proceed on August 1, 2006. The evidence and arguments of counsel suggest that Plaintiffs would not have tendered the M/Y *Lady Jane* unless and until Defendant gave in to Plaintiffs' demands regarding their interpretation of the settlement agreement. Although this issue has not been raised by Defendant, Plaintiffs' conduct could be viewed as a breach of the implied covenant of good faith and fair dealing. Cf. RESTATEMENT (SECOND) OF CONTRACTS § 205, cmt. e (explaining, inter alia, that the obligation of good faith and fair dealing extends to "the assertion ... and litigation of contract claims and defenses," and may be violated by "asserting an interpretation contrary to one's own understanding").

**5. Defendant Failed to Timely Reimburse Plaintiffs for the Attorney's Fees, Expert Technical Fees and Costs Incurred in the Underlying Litigation, but this Failure does not Constitute a Material Breach of Paragraphs 6, 7 and 8 of the Settlement Agreement**

■ Plaintiffs allege that Defendant breached the settlement agreement when it failed to timely reimburse Plaintiffs for the attorney's fees, expert technical fees and costs incurred in the underlying litigation. (DE 102 at 6, 16–18). They contend that, under the terms of the settlement agreement, Defendant was "clearly obligated to pay Plaintiffs up to $150,000 for their attorneys' fees and costs and up to $60,000 for their 'expert technical' fees and costs on or before March 24, 2006." (*Id.* at 16). Plaintiffs then explain that it is undisputed that Defendant did not pay anything by that date, and ask this Court to award prejudgment interest from March 24, 2006. (*Id.*).

Defendant limits its response to the issue of expert technical fees and costs generated by Christopher Karentz, an in-house employee hired by Plaintiffs' counsel. (DE 103 at 11–12). Specifically, Defendant claims that it did not breach the settlement agreement when it rejected Plaintiffs' demand to pay more than $39,008.23 for expert technical fees and costs because it never contemplated that Mr. Karentz would be part of the expert technical fees and costs, and because he was never disclosed as a testifying expert and never authored an expert report in this matter. (*Id.*).

The Court construes Plaintiffs' fourth contention as an allegation that Defendant breached paragraphs 6, 7 and 8 of the settlement agreement by failing to remit payment of attorney's fees, expert technical fees and costs on or before March 24,

2006. Upon a review of all the evidence admitted in this case, including the plain language of the settlement agreement, the Court concludes that Plaintiffs have satisfied their burden of proof on this allegation. However, as explained in more detail below, Defendant's failure to tender the full amount of attorney's fees, expert technical fees and costs when due does not constitute a material breach of the settlement agreement.

On January 23, 2006, Plaintiffs' counsel requested payment of attorney's fees, expert technical fees and costs in the total amount of $205,521.39. (DE 94 [Ex. 8]). In support, counsel submitted: (1) a "matter ledger" evidencing fees and costs in the total amount of $166,498.66 ($165,136.66 + $1,362.00 = $166,498.66); and (2) a spread sheet (with supporting documents) from L.T. Falcone, P.C., the certified public accountant for the M/Y Lady Jane, in the amount of $38,768.33, and an invoice from Advanced Mechanical Enterprises, Inc. in the amount of $254.40, evidencing expert technical fees and costs in the total amount of $39,022.73 ($38,768.33 + $254.40 = $39,022.73). (Id.). Notably, this letter did not explain whether Plaintiffs were treating any of the fees and costs evidenced in the matter ledger as expert technical fees and costs.

By letter dated March 30, 2006, Plaintiffs' counsel expressed concern over the lack of payment, and requested Defendant to forward the funds made payable to Gerald Abrams. (Id. [Ex.16]). Counsel for Defendant responded on March 31, 2006, advising that the letter had been passed onto their client and a response could be expected "sometime towards the end of next week." (Id. [Ex.17]).

On April 19, 2006, Plaintiffs' counsel gave Defendant's counsel written notice that Defendant had committed an anticipatory breach of the settlement agreement, and demanded Defendant to take immedi-ate action to bring its conduct into compliance with the terms of the settlement agreement on or before April, 21, 2006. (Id. [Ex. 21]). On April 28, 2006, Plaintiffs' counsel, in discussing the issue of fees and costs, explained it was their understanding, based on the settlement agreement and subsequent negotiations of a "more formal" settlement agreement, that the parties subsequently agreed to set a cap on the total amount of "fees and costs" at $210,000.00. (Id. [Ex. 23]). Again, however, this letter did not explain whether Plaintiffs were treating any of the fees and costs evidenced in the matter ledger submitted on January 23, 2006 as expert technical fees and costs.

By letter dated May 3, 2006, counsel for Defendant wrote:

We have reviewed the invoices and documents you provided to us regarding attorneys and expert fees incurred by Mr. Abrams. We also understand from speaking with Mr. Valcourt no additional invoices exist for expert/technical fees incurred in this matter. In accordance with the [settlement agreement] ... we hereby advise, in compliance with [paragraph 6 of the settlement agreement], Detroit Diesel is issuing a check payable to Houck Anderson, P.A. in the amount of $150,000.00 for their attorneys' fees and costs incurred in this matter. In compliance with [paragraph 7 of the settlement agreement], Detroit Diesel is issuing a check payable to Houck Anderson, P.A. in the amount of $39,008.23 representing actual expert technical fees and costs incurred in this matter.

(DE 94 [Ex. 24]). Counsel for Defendant also rejected Plaintiffs' counsel's proposed language in the "more formal" settlement agreement, explaining "[t]he agreement was never to provide a sum total of $210,000 in 'actual attorneys fees and costs and actual expert technical fees and

costs.' " (Id.). Defendant's counsel declined to revisit this issue by letter dated May 9, 2006, and transmitted a check in the amount of $189,008.23 payable to Houck, Hamilton & Anderson, P.A. and Gerald Abrams by letter dated June 12, 2006. (Id. [Ex. 26, 29] ).

Plaintiffs' counsel rejected payment by letter dated June 21, 2006, explaining, among other things, that "the amount is ... incorrect as the total costs of attorney's fees and expert costs submitted was $205,521.39." (Id. [Ex. 32] ). Although Plaintiffs' counsel demanded immediate payment in the amount of $205,521.39, they still did not explain whether any of the fees and costs claimed in the matter ledger were being claimed as expert technical fees and costs.

On June 28, 2006, counsel for Defendant responded that it would "reconsider the amount paid in expert cost if provided with proof—ie—breakdown of attorney and in-house expert costs," and requested Plaintiff's counsel to provide additional documentation. (Id. [Ex. 33] ). By letter dated July 12, 2006, counsel for Defendant enclosed a second check in the amount of $189,008.23 and explained that Defendant's "offer to reconsider payment of additional 'in-house expert' fees/costs remains open assuming Detroit Diesel is provided with the breakdown of the fees/costs." (DE 94 [Ex. 35] ).

Plaintiffs' counsel rejected this second payment by letter dated July 17, 2006. (Id. [Ex. 36] ). In so doing, they submitted additional documentation in response to Defendant's offer, stating:

> Pursuant to our earlier settlement discussions regarding additional support for expert costs paid directly by Houck Anderson on behalf of Gerald Abrams, enclosed please find copies of two checks; one in the amount of $2,505.00 and [a second in the amount of] $1,575.00 for Exponent's invoices numbered [17772], 19461 and [21119]. The amount of these expert costs, which were included in the law firm's matter ledger in our January 23, 2006 correspondence, totals $4,080.00. This brings the total amount of outside experts to $43,102.73.
>
> Additionally, we provide the requested further breakdown the expert work of Captain Karentz. Captain Karentz's work in preparing the vessel for seatrials and attending seatrials totaled $13,317.00. Please find Captain Karentz's time diary attached for support of this expert work. We have redacted the attorney client and work product parts of the diary for obvious reasons. Thus, Gerald Abrams' total payment for experts comes to $56,419.73.
>
> Thus the break down as follows:
>
> | | |
> |---|---|
> | Attorneys' Fees and Costs | $ 149,101.66 |
> | Out side/inside experts costs | $ + 56,419.73 |
> | Total: | $ 205,521.39 |
>
> We trust this information is adequate support documentation for the attorneys' fees and expert costs up to settlement. We note the request for this documentation came well after the sixty (60) days the funds were due and owing. Therefore, we hereby request that a check or checks be issued and payable to "Gerald Abrams" pursuant to the settlement agreement in the total amount of $205,521.39.

(Id. [Ex.36] ).[13] By letter dated August 3, 2006, counsel for Defendant enclosed a

---

13. Thus, Plaintiffs' counsel, in order to clarify its position regarding the total fees and costs evidenced in the matter ledger, subtracted $4,080.00 representing the previously unidentified invoices from Exponent, and $13,317.00 representing some, but not all, of the time and fees billed by Mr. Karentz, an in-house employee ($166,498.66—$17,397.00 [$4,080.00 + $13,317.00] = $149,101.66). Plaintiffs' counsel then reclassified the time and fees billed by Mr. Karentz as "expert technical" fees and costs, and added the previously un-

third check in the amount of $189,008.23 and explained that "[o]ur clients are in the process of reviewing the recently submitted detail regarding your 'in-house' expert, Christopher Karentz's fees incurred in this matter, and will advise us in the short term whether an additional check will be issued." (DE 94 [Ex. 39] ).

Mr. Karentz did not testify at the evidentiary hearing in this matter. Mr. Abrams, however, testified that Mr. Karentz is a very knowledgeable specialist with a huge background. (DE 99 at 15). He explained further that Mr. Karentz assembled the team of experts on behalf of the Plaintiffs, and monitored the Defendant's experts while they performed tests. (Id. at 16). Mr. Abrams testified that Mr. Karentz did all of the technical work with Defendant. (Id.).

Based on a preponderance of the evidence, the Court concludes that Plaintiffs may claim Mr. Karentz's fees and costs contained in the "time diary" as expert technical fees and costs. The plain language of paragraph 7 of the settlement agreement states that Defendant agrees to pay "up to and including $60,000 of expert technical fees and costs." It does not state that expert technical fees and costs are limited to only those individuals who were disclosed as a testifying expert or who authored an expert report in this matter. Thus, it is irrelevant whether Mr. Karentz is, or is not, qualified to testify as an expert witness. The pivotal question is whether Mr. Karentz was working on expert or technical matters, or providing services in the nature of an expert or technical witness. The non-redacted entries contained in the "time diary" submitted by Plaintiffs' counsel by letter dated July 17, 2006 demonstrate that Mr. Karentz was indeed working on expert or technical matters, or providing services in the nature of

an expert or technical witness. (DE 94 [Ex. 36] ). The testimony of Mr. Abrams, which has not been impeached, provides additional support for this conclusion.

Defendant's failure to tender the full amount of attorney's fees, expert technical fees and costs when due does not constitute a material breach of the settlement agreement because the delay in performance was relatively minor and not of the essence of the agreement between the parties. When Plaintiffs' counsel submitted their documents evidencing fees and costs on January 23, 2006, they demanded payment in the amount of $205,521.39 without explaining whether they were treating any of the fees and costs evidenced in the matter ledger ($166,498.66) as expert technical fees and costs. Plaintiffs' counsel only submitted invoices for expert technical fees and costs in the amount of $39,022.73. These invoices were paid by Plaintiffs to various third-party, expert witnesses for professional services. This discrepancy created confusion over whether Plaintiffs were attempting to claim attorney's fees and costs over the $150,000.00 cap, caused a delay in overall performance, and significantly contributed to this particular dispute.

Defendant tendered payment in the amount of $189,008.23 by letter dated May 9, 2006—a total of 106 days after January 23, 2006, and a total of 46 days after March 24, 2006. Plaintiffs' counsel rejected this tender 43 days later, again demanding payment in the amount of $205,521.39 without additional support or explanation. Plaintiffs submitted additional documentation evidencing the total fees and costs by letter dated July 17, 2006. This documentation amended the total for

---

identified invoices from Exponent to obtain a revised total of $56,419.73 for expert techni-

cal fees and costs ($39,022.73 + $17,397.00 [$4,080.00 + $13,317.00] = $56,419.73).

each category of fees and costs. Thus, at that time, Plaintiffs were entitled to receive payment of their attorney's fees and costs in the amount of $149,101.66 ($166,-498.66—$17,397.00 [$4,080.00 + $13,317.00] = $149,101.66), and payment of their expert technical fees and costs in the amount of $56,419.73 ($39,022.73 + $17,397.00 [$4,080.00 + $13,317.00] = $56,419.73), for a combined total of $205,521.39 ($149,101.66 + $56,419.73 = $205,521.39).

Under paragraph 8 of the settlement agreement, Defendant was obligated to remit payment within sixty days of receipt of invoices—*i.e.*, on or about September 15, 2006. Defendant tendered payment in the amount of $189,008.23 by letter dated August 3, 2006. This partial payment was timely under paragraph 8 of the settlement agreement.

Accordingly, based on the evidence before the court, Plaintiffs are entitled to receive an additional payment in the amount of $16,513.16 ($205,521.39—$189,008.23 = $16,513.16). Plaintiffs are also entitled to recover pre-judgment interest on this amount from September 15, 2006 to the date of final payment at the rate of 8.25% per annum or $3.73 per day. *See, e.g., Sunderland Marine Mut. Ins. Co. v. Weeks Marine Constr. Co.,* 338 F.3d 1276, 1280 (11th Cir.2003) ("It is the general rule of this circuit to award pre-judgment interest in admiralty cases."); *Marine Overseas Servs. v. Crossocean Shipping Co.,* 791 F.2d 1227, 1236 (5th Cir.1986) ("As a general rule, pre-judgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds the claimant was rightfully entitled."). To the extent Defendant has not already done so, they should remit payment of any outstanding balance, within a reasonable time, to Plaintiffs' counsel according to their instructions.

### 6. Plaintiffs did not Breach the Settlement Agreement

Defendant alleges that Plaintiffs have committed a material breach of the settlement agreement by: (1) failing to provide notice, in writing, of an agreed shipyard for the installation of engines, gears and accessories; (2) failing to deliver the M/Y *Lady Jane* to the Cable Marine shipyard, despite Defendant's request to do so; and (3) failing to execute a reasonable confidentiality agreement. (DE 103 at 3). Defendant does not seek money damages. They merely argue that their failure to comply with the terms of the settlement agreement precludes the right to seek specific performance.

Upon a review of all the evidence admitted in this case, including the plain language of the settlement agreement, the Court concludes that Defendant has failed to satisfy its burden of proof on this allegation. This Court has already concluded that the parties' subsequent conduct and oral representations establish that Cable Marine is the "mutual agreeable" shipyard. The Court cannot hold Plaintiffs in breach for failing to bring the M/Y *Lady Jane* to Cable Marine because the express language of the settlement agreement did not contain such an obligation. As a result, the Court has supplied this omitted, essential term to the settlement agreement. Finally, and with respect to Plaintiffs' obligation to sign a reasonable confidentiality agreement, the plain language of paragraph 10 does not specify a date certain when Plaintiffs must do so. The settlement agreement remains an executory contract.

### F. The Parties are not Entitled to Recover any of the Monetary or Equitable Relief Requested in Prosecuting or Defending the Motion to Enforce Settlement Agreement, Except Plaintiffs are Entitled to Recover Pre–Judgment Interest

General federal maritime law governs the validity and enforceability of the settlement agreement, including the rights, liabilities and remedies of the parties. *See* discussion *supra* Part II.A. Because this Court finds that neither party has committed a material breach of the settlement agreement, they are not entitled to recover any of the monetary or equitable relief requested in prosecuting or defending the Motion to Enforce Settlement Agreement, including compensatory damages, punitive damages, attorney's fees, costs, specific performance, diminution in market value of the M/Y *Lady Jane* as a result of the delay in carrying out the engine replacement, or sanctions. *(See, e.g.,* DEs 55 at 11–15; 102 at 39–41). Plaintiffs, however, are entitled to recover pre-judgment interest on the outstanding balance of expert technical fees and costs as discussed above.

Assuming *arguendo* that Defendant committed a material breach of the settlement agreement, the undersigned concludes that Plaintiffs would not be entitled to attorney's fees, punitive damages or sanctions because Plaintiffs have not met the standards established for such awards in admiralty law. Indeed, attorney's fees "are not ordinarily awarded in admiralty cases." *Goodman v. 1973 26 Foot Trojan Vessel, Arkansas Registration No. AR1439SN,* 859 F.2d 71, 74 (8th Cir.1988); accord *Stires,* 243 F.Supp.2d at 1322–23 (explaining that, under federal maritime law, "a prevailing party is not entitled to attorney's fees in an admiralty case unless fees are statutorily or contractually au-

thorized"); *Garan Inc.,* 907 F.Supp. at 399–400. "An exception is made to this general rule when the losing party has acted in bad faith." *Goodman,* 859 F.2d at 74; *see also Southworth Mach. Co.,* 994 F.2d at 41 (explaining that, under admiralty law, "the parties pay their own fees absent bad faith or oppressive litigation tactics"); *Templeman v. Chris Craft Corp.,* 770 F.2d 245, 250 (1st Cir.1985) (explaining that, under admiralty law, "a court has inherent power 'to assess attorneys' fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons' "). Similarly, "[a] court may award punitive damages where the defendant's actions were intentional, deliberate, grossly negligent, or so wanton and reckless as to demonstrate a conscious disregard for the right of others." *DeRossi,* 328 F.Supp.2d at 289; *accord Stires,* 243 F.Supp.2d at 1322–23; *Norwalk Cove Marina, Inc.,* 90 F.Supp.2d at 193.

In this case, the settlement agreement does not provide for an award of attorney's fees and costs to the prevailing party. Furthermore, the evidence fails to demonstrate that Defendant acted in bad faith, with evil motive or reckless indifference to the rights of others, or attempted to undermine the settlement agreement.

## III. RECOMMENDATION TO THE DISTRICT COURT

In summary, the undersigned **RECOMMENDS** that the Motion to Enforce Settlement Agreement (DE 46) be **GRANTED** in part and **DENIED** in part, and that the District Court: (1) apply general federal maritime law to this dispute; (2) enforce the terms of the settlement agreement as interpreted and construed herein; (3) sustain all of Defendant's objections regarding extrinsic evidence, parol or otherwise, proffered to show meaning, intent, and antecedent understandings and negotiations; (4) find that the settlement agree-

ment has not been materially breached by the Defendant or Plaintiffs; (5) award Plaintiffs pre-judgment interest on the outstanding balance of expert technical fees and costs; and (6) decline to award the parties any other monetary or equitable relief requested in prosecuting or defending the Motion to Enforce Settlement Agreement. In all other respects, the Motion to Enforce Settlement Agreement should be **DENIED.**

### NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Daniel T.K. Hurley, United States District Judge for the Southern District of Florida, within ten (10) days of being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(C); *United States v. Warren,* 687 F.2d 347, 348 (11th Cir.1982). Failure to timely file written objections shall bar the parties from attacking on appeal the factual findings contained herein. *See LoConte v. Dugger,* 847 F.2d 745 (11th Cir.1988); *RTC v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND SUBMITTED** in Chambers this 29 day of May, 2007 at West Palm Beach in the Southern District of Florida.